WELTY ESTATE *v.* WOLF ESTATE.

1. AUTOMOBILES—NEGLIGENCE—EVIDENCE—DEATH.

Verdict was properly directed for defendant in action by administrator of estate of claimed passenger against estate of claimed host motorist, where evidence of negligence of host was insufficient to raise a question of fact even if plaintiff's decedent was a passenger for hire, it being shown there was other traffic in the immediate vicinity which could have affected the host's action, in addition to testimony of skid marks made by the death car on the wet black-top pavement about midmorning in mid-September.

2. SAME—GUEST PASSENGER—EVIDENCE—BURDEN OF PROOF.

Evidence presented in record in action by administrator of estate of claimed passenger against estate of claimed host *held,* insufficient to raise a question for jury as to whether or not plaintiff's decedent was a guest passenger, the burden of proof being upon plaintiff to show that such relation did not exist in order to recover for less than gross negligence on the part of the host (CLS 1954, § 257.401).

3. SAME—PASSENGERS—NATURE OF RELATION TO HOST.

Whether the relationship between a passenger and motorist is that of guest passenger or a passenger for hire depends upon the facts of each case (CLS 1954, § 257.401).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur, Automobiles § 667.

[2–5] 5 Am Jur, Automobiles § 239.

[2, 3] Who is guest within contemplation of statute regarding liability of owner or operator of motor vehicle for injury to guest. 82 ALR 1365, 95 ALR 1180.

[4, 5] Payments or contributions by or on behalf of automobile rider as affecting his status as guest. 10 ALR2d 1351.

[6] 5 Am Jur, Automobiles §§ 240–243.

[6] What amounts to gross negligence, recklessness, or the like, within statute limiting liability of owner or operator of automobile for injury to guest. 74 ALR 1198, 86 ALR 1145, 96 ALR 1479.

[7] 5 Am Jur, Automobiles § 657.

4. SAME—PASSENGERS—ALTERNATE DRIVING BY FELLOW EMPLOYEES.

A passenger-for-hire relationship between fellow employees of same employer was not established under evidence showing merely that the passenger and host drove their own cars to work on alternate days without an obligation to pay a definite amount in the event of default of either driver (CLS 1954, § 257.401).

5. SAME—RELATIONSHIP BETWEEN PASSENGER AND MOTORIST—PRESUMPTION OF CONTINUITY—GUEST PASSENGER—EVIDENCE.

Whether or not presumption of continuity applied to relationship between passenger and host, where there was some testimony tending to show a previously-existing passenger-for-hire relationship, is not determined, where there is not a preponderance of evidence that the passenger was not a guest passenger (CLS 1954, § 257.401).

6. SAME—GROSS NEGLIGENCE—EXCESSIVE SPEED.

Excessive speed by host motorist is not, alone, sufficient to base a finding of gross negligence or wilful and wanton misconduct on his part and impose liability under the guest passenger act. (CLS 1954, § 257.401).

7. SAME—NEGLIGENCE—CIRCUMSTANTIAL EVIDENCE.

Circumstantial evidence presented by plaintiff in her action against estate of deceased motorist for death of her husband *held,* insufficient to take case as to motorist's negligence out of realm of conjecture and into the field of inference from established facts.

8. NEGLIGENCE—RES IPSA LOQUITUR.

The rule of *res ipsa loquitur* does not prevail in this State.

SHARPE, SMITH, and BLACK, JJ., dissenting.

Appeal from Cass; Mosier (Carl D.), J. Submitted January 6, 1956. (Docket No. 47, Calendar No. 46,681.) Decided April 2, 1956.

Case by estate of Allen Welty, deceased, by Opal Pauline Welty, administratrix, against estate of George Wolf, deceased, Marjorie L. Grace, administratrix, under death act where passenger and driver under car-pool arrangement were killed when automobile struck tree. Directed verdict and judgment for defendant. Plaintiff appeals. Affirmed.

*Carroll B. Jones,* for plaintiff.

*Reagh, Denfield & Reid,* for defendant.

BLACK, J. (*dissenting*)... This case was tried to a jury in Cass county before Honorable Carl D. Mosier, circuit judge, and resulted in judgment for defendant on directed verdict. The action was brought for wrongful death, arising from violent collision of an automobile with a roadside tree. The tree did not give and both occupants of the automobile were instantly killed.

The occupants were plaintiff's decedent and defendant's decedent. The time was September 17, 1954, about mid-morning. The place was highway M-62, a mile or so northeast of Edwardsburg in Cass county. No witness of cause or immediately precedent fact survives and we are left with presumption and circumstance for determination of reviewable questions.

The trial judge, on motion presented at close of plaintiff's case, directed a verdict for defendant. His assigned reason was:

"But what caused the accident is purely a matter of guess, a matter of speculation. Inasmuch as negligence must be established by a fair preponderance of the evidence, and it must be established that such negligence was the moving or the proximate cause of the accident, that proof is lacking and it would be improper to submit to the jury to assume to fill in the gaps that are lacking by the evidence that is here produced."

Plaintiff's appeal tests, as against the motion below, the question whether evidence was presented on which the jury might with propriety have found:

1. That defendant's decedent was driver of the death car.

2. That her decedent was a so-called passenger for hire.

3. That defendant's decedent was guilty of actionable negligence.

*First:* The car in which both men died was a Pontiac. It belonged to defendant's decedent Wolf. That fact gives rise to a rebuttable presumption that he was driving at the time (*Rodney* v. *Staman,* 371 Pa 1 [89 A2d 313] in 32 ALR2d 976, annotating subject "Proof, in absence of direct testimony by survivor or eyewitnesses of who, among occupants of motor vehicle, was driving at the time of accident"). The collision was left broadside against the tree with crushing wrap-around result. The upper half of the body of plaintiff's decedent Welty was found, a few moments after impact, hanging out of the right side of the car. The body of defendant's decedent lay atop but not so far out of the car. The latter's left leg was so firmly pinned between the fire wall and the bent-in left door as to require pulling the car apart before the body could be removed.

There was ample circumstantial evidence, apart from foregoing presumption and quite in accord therewith, on which the jury could have found that defendant's decedent was the driver and plaintiff's decedent the passenger (*Ricketts* v. *Froehlich,* 218 Mich 459, 462; *Koob* v. *City of Lansing,* 321 Mich 150; *Blake* v. *Brama,* 343 Mich 27, 32).

*Second:* Harold Cooper, residing at Jones, Raymond Helwig, residing at Three Rivers, Allen Welty, residing at Marcellus, and George Wolf, residing at Long Lake, were steady employees of Clifton Engineering Company. The usual and common place of employment was South Bend. They entered in succession upon a continuing agreement for motorcar transportation to and from work, between Jones, the agreed place of meeting and disbanding, and South Bend. Cooper and Welty initiated the "ar-

rangement" (so termed by witnesses Cooper and Helwig) in 1952. Helwig and Wolf joined as participants in 1954. Other employees of Clifton occasionally joined the arrangement, the gist of which was payment by each passenger, to each owner-driver fellow-employee, of 75 cents per day for the round-trip transportation. The participants also agreed on alternate driving of cars. Welty and Wolf, owners respectively of Chevrolet and Pontiac cars, did most of the driving. Participants not driving on the given day would leave their cars in the lot of a gasoline station on highway M-60, at Jones. The round trip, from Jones to South Bend and return, was 80 road miles.

The gasoline station proprietor testified to the continued practice of the participants, so far as meeting and separating at his station was concerned, and to the fact that Welty's car was parked in the lot "all day," referring to the date of the fatal collision. He did not witness the departure that day, having left earlier for South Bend on his own business.

Cooper's work for Clifton was transferred, 2 months prior to the collision, from South Bend to Benton Harbor. He consequently and thereupon ceased participation in the Jones-to-South Bend arrangement. Helwig ceased riding with Welty and Wolf, about a week prior to the accident, for reason given by him as follows:

"Before the accident I had been down the road with another crew that worked in South Bend, and I rode back and forth with them. During the week previous to the accident I worked in South Bend, rode with the other crew. Another crew came from Three Rivers so I drove with them clear through. It was a new group that had just started so I got a ride clear through. I started working for the Clifton Engineering Company on August 16, 1950, and am still working for them. I rode with Wolf and Welty

about 6 months, up to the time I rode with this other group. * * *

"On the day of the accident when both Mr. Wolf and Mr. Welty were killed, I, of course, was not riding with them. I rode with a fellow by the name of Norm something, from Three Rivers. I paid him 75 cents. I rode with Welty and Wolf when I couldn't ride with the other fellow. If there was somebody else going to South Bend on the job, I could ride with them. I had no car to offer to this transportation situation."

Cooper summed up the arrangement as known to him in the following language:

"The conversation was just the same between them (Welty and Wolf) as it was between all of us men at that time. Either you furnished the car and exchanged with each other, or you paid 75 cents a day. It was stated to Wolf at that time, same as it was to me. That expressed the arrangement that we had had, and as a result he agreed to that and drove.

"Welty said we have arrangements with these certain conditions that either if you had a car, you would exchange driving, or else you would have to pay 75 cents a day for transportation. Wolf said to that that it was satisfactory to him. After that, they proceeded under that arrangement. * * *

"After that, we either drove or paid per day. Mr. Welty drove part time, Mr. Wolf part time and I drove when I had a car that was fit to drive. I drove or exchanged. One drove as much as the other, as far as I could see. Maybe one man would have to have other use of his car, and the other man would have to pay for that day or some day previous."

Defendant contends that Cooper's knowledge of the arrangement is too remote, he having ceased participation 2 months previous to the date of collision, and she correspondingly points to Helwig's joinder of another group of employees a week previous to the same date. It is said that the testimony

of the two should be disregarded—that neither one knew what if any final arrangement existed between Welty and Wolf—and that the allegation of passenger-for-hire relationship consequently fails for want of proof. The contention is answered by an old and valuable presumption—that of continuity (*Ormsby v. Barr,* 22 Mich 80, at page 85; *Hensel v. Maas,* 94 Mich 563, at page 568; and *Norris v. American Steam Pump Co.,* 255 Mich 144). Professor Jones puts it this way (1 Jones, Commentaries on Evidence [1st ed] "The Bluebook of Evidence," p 284):

"When things are once proved to have existed in a particular state, they are presumed to have continued in that state until the contrary is established by evidence, either direct or presumptive."

It is circumstantially established that plaintiff's decedent Welty and defendant's decedent Wolf left Jones on the stated date for South Bend, at the regularly-appointed time, in pursuance of the aforesaid transportation arrangement; that they proceeded to South Bend only to learn that no work would be done that day on account of rain, and that the collision resulting in death of each occurred during course of the return trip.

Turning now to the principal issue as briefed: Plaintiff relies on *Bond v. Sharp,* 325 Mich 460. Defendant relies on *Bredeweg v. Boyce,* 322 Mich 298 and *Everett v. Burg,* 301 Mich 734 (146 ALR 639). One urges that the question of legal relationship between Welty and Wolf is one of law for the court. The other insists that it is one of fact for jury per demand below. Without hesitation, this writer stands for the latter.

The record negatives an offer by defendant's decedent to give plaintiff's decedent "a ride before any offer of compensation was made" (*Shumaker v. Kline,* 333 Mich 346, 351). We cannot say that "the

arrangements between the parties are so indefinite and casual that sociability is the dominant element" (*Bond* v. *Sharp, supra,* 464, characterizing *In re Harper's Estate,* 294 Mich 453; *Guiney* v. *Osborn,* 295 Mich 559; and *Brody* v. *Harris,* 308 Mich 234 [155 ALR 573]). Neither may we call the arrangement shown here a "mere act of courtesy extended to a friend which he undoubtedly would have rendered without reference to his having ridden in defendant's automobile" (*Wilcox* v. *Keeley,* 336 Mich 237, 245). The purpose of all these Clifton employees was that of compensating the driver-owner for transportation to and from work, on a "cheaper-for-all" basis of mutual benefit, and the requisite passenger-for-hire relationship was thus prima facie established.

Holding as I do that the question-of-fact doctrine of *Bond* should apply here, a compelling duty respecting *Everett* remains. The latter, I suggest, cannot be squared plausibly or otherwise with *Bond.* It should not be left at large to confound lawyers and circuit judges further, as it did in the case of *Bond.* I therefore move on this first conference day of the year (March 1, 1956)* that *Everett* be overruled. My reasons follow.

These continuing transportation agreements of fellow-employees are not illegal. Neither do they violate rules of policy or morals. We are close to judicial notice of their widespread adoption by neighboring workers engaged in common employment as the trend toward country living and growth of "bedroom" townships visibly expands before us, and we have no right to dilute or destroy their effect through application of fustian legal notion, generated exclusively in these chambers, that an honest contract between honest men is on account of so-

---

* This case was decided April 2, 1956.—REPORTER.

ciability 'nullified as a matter of law. The issue is generally one of fact—not law—and we should say so. Must these men become coldly dissocial in order that their agreed relationship be or remain effective in the courts? Must they by same token make sure their wives visit not, and that they exchange no recipes, across the backyard fence? Have we arrived at point where lawyers, when asked for advice respecting validity and effect of these transportation agreements, must warn against semblance of friendship or social relations with involved fellow-employees lest such undertakings be characterized as mere "exchange of amenities"? If such be the law—I turn to Dickens for dignity—"the law is a ass, a idiot."

These words are aimed at *Everett,* where the decedent's personal representative was cast out of court on opening statement. The case is a poorly-considered *nullius filius* and it should now be cast out with observation that a jury is eminently better qualified to judge the line of demarcation, between the social and the contractual in specific instance shown in *Everett, Bond,* and now Welty, than we are.

What is more, *Everett* is fair specimen of dismaying tendency in our State toward curled-lip service of the rule of favorable view. Every motion for directed verdict skirts edge of constitutional right of trial by jury. The great legal scholars we are honored to succeed caution us accordingly. Only the testimony and only the permissible inference or inferences that unitedly aid the target of the motion are before the court which engages upon test thereof. All evidence so singled out—testimony plus inference—is to be viewed in legal light most favorable to such target-party. Indeed, "the most favorable construction that can possibly be given to such testimony" is basic guide (*Gibbons* v. *Farwell,* 63

Mich 344 [6 Am St Rep 301]). The motion thus becomes an implied stipulation of the moving party, to and with court and opposing party, that the court for purposes thereof will cast aside all opposing testimony and inference—even that which merely tends to dilute or render uncertain the favorable—and that the case so stripped is to be the basis, if any, for saying, as a matter of law, that there is a total want of evidence justifying jury verdict for such opposing party. If this be right, and the rule in variant language has been echoed and followed in at least fourscore cases, the error of *Everett* becomes evident.

It is easy, of course, to write an opinion like that shown in *Everett*. It is easier, too, for the trial judge in border case to direct a verdict rather than hew out a charge from books and conflicting requests to charge and then face argument, instruction, tedious hours of jury deliberations, and possibly arduous work on motion for judgment notwithstanding verdict. The judiciary nevertheless should refrain from the easy path toward solution of close or doubtful case, and the hour is late for relevant self-appraisal. Our circuit judges will, I apprehend, cheerfully attend historic rules of practice governing motions for directed verdict if we will but lead the way and refrain, say, from additional exhibition of "our skepticism" (*Persail* v. *Moseley,* 343 Mich 78) when forced to follow the guide of favorable view.

In a spirit of inoffensive and parenthetical satire this recent-from-law-office jurist observes that the implicitly telegraphed message of *Persail* was probably not lost on counsel. It well might read like this: "You are getting by us now on account of forced favorable view but just wait until that motion for new trial, aimed at clear weight, gets here."

*Third:* The bituminous pavement of M–62 in vicinity of the collision was level and straight. The death car first left the pavement on the right or east side, where it traveled 12 to 15 feet leaving "freshly-upturned dirt." In its traced course forward there was "then a space where there was no track" and "then black skid marks started on the westerly (left) side of the road." These skid marks continued 80 feet, diagonally from left to right side of pavement, to the point where they left the pavement and led in long diagonal an additional 70 feet to the car at final position against the tree. The tree was 12 to 15 feet from the nearest (east) edge of the pavement. The skid marks indicated that the car was completely out of control and that it was traveling sidewise "with all 4 wheels locked."

The pavement was wet with light rain. No traffic was in the vicinity at the time, and no factor excepting inferable excessive speed on a slippery pavement was shown as cause of the driver's lack of control.

Mr. Justice Cooley tells us (*Alpern* v. *Churchill,* 53 Mich 607 at page 613):

"Negligence, like any other fact, may be inferred from the circumstances; and the case may be such that, though there be no positive proof that defendant has been guilty of any neglect of duty, the inference of negligence would be irresistible."

We have alleged adherence to that doctrine ever since (*Burghardt* v. *Detroit United Railway,* 206 Mich 545 (5 ALR 1333); *Pattinson* v. *Coca-Cola Bottling Company of Port Huron,* 333 Mich 253; *Spiers* v. *Martin,* 336 Mich 613). In the *Burghardt Case* Mr. Justice Fellows, speaking for the Court on strength of 11 cited cases, said (pp 546, 547):

"This Court has not adopted the rule *res ipsa loquitur;* we have uniformly held that the happening of the accident alone is not evidence of negligence;

and we have as uniformly held that negligence may be established by circumstantial evidence, and that where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts that at least a prima facie case is made."

Proof that a motorcar has skidded, in circumstances similar to those shown here, is some evidence of negligence on the part of its driver (*Gates* v. *Landon,* 216 Mich 417; *Deyo* v. *Detroit Creamery Co.,* 257 Mich 77; *Kolehmainen* v. *E. E. Mills Trucking Company,* 301 Mich 340; *Brown* v. *Arnold,* 303 Mich 616; *Humphries* v. *Complete Auto Transit, Inc.,* 305 Mich 188; and *Leeds* v. *Masha,* 328 Mich 137). Every motorist presumably knows the effect of light rain on conventional black-top pavements. Whether the driver in this case knew or should have known of the rain-caused slippery condition, and whether he exercised due care with regard thereto according to fundamental doctrines of the law of negligence, was and is a question of fact. The trial judge therefore erred in pronouncing the issue one of law.

It is said, however, that the presumption of due care attended the driver in this case. Agreed. But the presumption is opposed by circumstantial evidence of negligence on his part, and the result is a typical question of fact to be disposed of under rules given in the useful and carefully considered opinion of *Gillett* v. *Michigan United Traction Co.,* 205 Mich 410.

The words "speculation" and "conjecture" have been overworked a bit in this case. They should be relegated to proper position else they become juristically shopworn. As was said by Mr. Justice Fellows, again for unanimous Court (*Collins* v. *Perry,* 241 Mich 361, 362, 363):

"1. It is insisted that there was no evidence to take the question of defendant's negligence to the

jury; that the happening of the accident alone is not evidence of negligence and that the plaintiff's case at most rested on conjecture, surmises and guesses. This Court has consistently refused to adopt the rule of *res ipsa loquitur* and has as consistently held that cases may not go to the jury where recovery can only be based on guesses, conjectures, and speculation. But we have also pointed out that there is a difference between conjecture and the weighing of probabilities from the established facts."

Mr. Justice NELSON SHARPE, speaking for the Court, put it this way in *Butrick* v. *Snyder,* 236 Mich 300, 305:

"While it is true that a verdict may not rest upon bare conjecture (*Fuller* v. *Ann Arbor R. Co.,* 141 Mich 66 [18 Am Neg Rep 489] ), it is also true that a finding as to a particular fact may be based upon inferences fairly drawn from other facts established by proof. *Waidelich* v. *Andros,* 182 Mich 374."

To the same effect is *Richardson* v. *Detroit & Mackinac R. Co.,* 176 Mich 413, an instructive death case where circumstance and inference alone were held sufficient to create issues for the jury as against claims of speculative cause and conjectural occurrence.

The question of contributory negligence, brought to us by the motion for direction below and counter-stated question here, is rendered moot by concession of defendant's counsel, appearing on page 13 of their brief, as follows:

"The defendant-appellee concedes that the plaintiff would be entitled to the presumption of due care and that there was no evidence to rebut this presumption. By the same token the deceased Wolf would also enjoy the same presumption and there was no evidence to rebut the presumption."

Wilful and wanton misconduct of defendant's decedent, alleged below and briefed here, need not be considered in view of the foregoing.

The judgment of the circuit court should be reversed, with costs to appellant.

SHARPE and SMITH, JJ., concurred with BLACK, J.

KELLY, J. Justice BLACK's opinion herein states:

"No witness of cause or immediately precedent facts survives and we are. left with presumption and circumstance for determination of reviewable questions."

If there is circumstantial evidence opposing the presumption of due care, such evidence is confined to proof of skid marks on the pavement and on the ground between the pavement and the tree.

The quoted testimony in Justice BLACK's opinion in regard to skid marks is from the testimony of Kenneth Duane Rimes. He was the only witness who gave any testimony in regard to same.

The accident occurred on September 17, 1954. Over 9 months elapsed before the case was called for trial. Rimes did not take any measurements of skid marks or tracks until the day of trial, as is evidenced by his testimony, as follows:

"I did not measure the skid marks myself, until this morning before the trial, but I was with an officer in charge who measured them, after the accident. Today I approximated it, then paced it off. I went out to the scene of the accident with Attorney Henry Theiss this morning to recollect what happened and recreate the scene in the presence of the attorney. My testimony is based both upon what I saw this morning and what I saw the day of the accident. Part of the testimony about skid marks is based upon what I observed this morning."

No explanation is offered in the record as to why the officer in charge after the accident, and who took the measurement of the skid marks, was not called as a witness.

Justice Black lists 6 cases involving skid marks, with the claim that said marks were considered as evidence of negligence "in circumstances similar to those shown here." I disagree with the conclusion that the circumstances were similar to those in the case we are considering. In all 6 of the cited cases testimony was offered in regard to the course of the vehicle before and at the time of the accident. The skid marks merely added proof to these facts. No case has been called to this Court's attention in either appellant's brief or in Justice Black's opinion, and the writer fails to find any case, where proof confined to skid marks was considered adequate to sustain plaintiff's claim of negligence.

Justice Black's opinion states: "No traffic was in the vicinity at the time." I do not believe the record sustains such a conclusion. If it does, it must be sustained by the only witness—Rimes—who gave any testimony from which this fact, or any other fact in regard to the accident, could be inferred.

The deceased's car and Rimes' car were traveling in the same direction, and while Rimes testified that he did not see the car leave the road and hit the tree, his testimony does show that he arrived at the scene immediately thereafter while the death car was still reacting to its impact with the tree. On direct examination he stated:

"As I broke over the hill, about a mile or mile and half north of Edwardsburg, there was a car that had just wrapped itself around the tree. There was still motion to the car, and the door was still swinging."

On cross-examination, this witness testified:

"When I came upon the scene, there was still motion; the car was still jiggling and the door waving. There was no dust, as it was raining. The door was still jiggling. I came upon the car that quick after it happened. The door that was jiggling was the right-hand door."

Rimes brought his car to a stop as soon as he could, but another car was in such close proximity to the death car as it left the road that its occupants stopped before Rimes. Rimes' testimony in this regard is:

"As soon as I came upon the accident, I stopped my car and parked it and immediately went to the car. There were other people about, not police officers at that time. Other persons had stopped there before I did. They were ahead of the car, and had apparently seen them in the mirror. They were ahead of the car that was wrecked. I did not get their names."

There is no further testimony in the record in regard to this car that was "ahead of the car that was wrecked," and said car will be referred to in this opinion as the "mystery car."

Justice BLACK's opinion states that "no factor excepting inferable excessive speed on a slippery pavement was shown as cause of the driver's lack of control." If the car in which deceased Welty and Wolf were riding was traveling at an excessive rate of speed, then there is evidence, by the following testimony of Rimes, that his car was probably traveling at a greater rate of speed. He said:

"I don't know how fast I was travelling in this rain as I proceeded north out of Edwardsburg. I did not see Mr. Wolf or Mr. Welty pass me between where I stopped and the scene of the accident, that I recall. If they would have passed me, I would not have recognized their car. I do not remember

whether anyone else passed me. It was too long ago. There was just moderate traffic coming in the other direction in this mile and a half. It wasn't raining hard, just a light mist. It was daylight. I had no one else riding with me. I could have been driving 50 miles an hour or faster. It could be assumed that either there was not much of a margin of distance at the time of the impact, or that I was travelling at a higher rate of speed, than they were."

Rimes describes a hill in close proximity to the tree, as follows:

"As I came over the hill, I saw this situation. There was a hill in close proximity to the tree. * * * Maybe it would be 250 yards, something like that from the crest of the hill to the tree. * * * As you come over the crest of the hill, you break off the hill, then there is a straightaway."

It would not take any appreciable length of time for a car driven at an excessive rate of speed to travel 250 yards. The testimony of Rimes establishes that the occupants of the "mystery car" could not have observed the death car for more than 250 yards after it came over the top of the hill. If the death car was traveling at such an excessive rate of speed, the question arises: How did the occupants of the "mystery car" make the observation of approach of the death car so that they could bring their car to a halt, in close proximity to the tree, and practically at the moment the death car hit the tree?

Did the "mystery car" crowd the death car off the road? Did the "mystery car" pass and sideswipe the death car as it passed? No one testifies that the death car was crowded off the road or was sideswiped. No one eliminates that possibility, and we must keep that in mind as we decide that on circumstantial evidence of skid marks sufficient proof was offered to justify a trial judge submitting the case to the jury.

Who was driving the death car? To prove this point, plaintiff offered only one witness. Again this same Mr. Rimes. He testified on direct examination:

"Mr. Welty was on the ground on the right-hand side of the car. I knew Mr. Welty, but not Mr. Wolf. Mr. Welty had his head hanging out the door, the upper half of the body. The other man was laying right on top of him; Wolf's left leg was pinned between the firewall and the left door, because afterwards we had to pull the car apart to free him."

On re-direct examination, witness Rimes testified:

"When I went up to the car, I saw the 2 men laying one atop of the other. One was further out the door than the other one. Mr. Welty was the one further out the door. Mr. Wolf's leg was pinned between the left door and the firewall on the left-hand side of the car. The firewall is the panelling immediately under the clutch and brake pedal. On account of the condition of the car it would be hard to tell what the spot was, but it was in the general area of where the door is, inside the car."

In addition to Rimes, plaintiff called 4 other witnesses. The wife of deceased Allen Welty testified but offered no proof on either the question as to how the accident occurred or the question as to whether her husband was a guest passenger or a passenger for hire. The other 3 witnesses, namely, Cooper, Helwig and Young, gave no testimony in regard to the accident, and their testimony can only be considered on the question as to whether plaintiff's decedent (Welty) was a passenger for hire.

The trial court in granting the motion for a directed verdict stated:

"I am in agreement with counsel for the defense that if this matter is submitted to a jury for determination, that the jury would be obliged by specu-

lation to fill in a number of important factors that are not shown by the evidence. This question as to the guest relationship between Mr. Welty and Mr. Wolf involves only one question, and that question is a legal question, and that is whether or not in such case, negligence of ordinary caliber would be grounds for an action or whether it would have to be negligence that was gross. I don't think it's necessary for this court to make a decision on the point as to whether the relationship of a paying guest existed between these 2 men."

The trial court was correct in granting the motion, even though the testimony in this case was sufficient to create a question of fact as to whether Welty was a passenger for hire in Wolf's car.

In *Bredeweg* v. *Boyce,* 322 Mich. 298, this Court held that under the guest act a plaintiff who relies upon ordinary negligence must show that the host-guest relationship did not exist in order to sustain his cause of action, and that this element of the case places upon the plaintiff the duty to establish the fact that a host-guest relationship did not exist by a preponderance of the evidence. The plaintiff in the instant case did not meet the test laid down in *Bredeweg* v. *Boyce.* The record does not disclose testimony sufficient to submit to the jury the question as to whether Welty was a passenger for hire.

Cooper did not ride with Welty or Wolf for a 2-month period preceding the accident, and offered no testimony in regard to the driving arrangement between them during this period. The essence of Cooper's testimony is as follows:

"The agreement was, Welty, Wolf and myself, was that—we were to pay 75 cents per day or drive.

"I did not have a car fit to drive all the time, but Wolf did. I did not ever see Wolf deliver over any money to Welty, nor Welty to Wolf. They switched driving their cars every other day. I did not recall

Welty missing any days, nor Wolf missing any days. As far as I know each day they would alternate driving their car. I rode along and paid 75 cents a day."

Helwig could give no testimony as to what arrangement existed between Welty and Wolf on the day of the accident, or for one week prior thereto. He testified:

"I stopped riding with them about a week prior to the accident. The arrangement of alternate driving and paying continued as long as I rode with them. * * * I always rode with Welty and Wolf every day that there was a working day, except sometimes I rode with other fellows when they rode from Three Rivers. I also paid them 75 cents. I did not have a car at that time, and I have none now. I paid 75 cents for the privilege of riding with these other men who did have a car. I know that between Welty and Wolf, one would drive one day and the other would drive the next. I never seen any money change hands between the 2 of them."

Witness Young testified that he ran a filling station and that Welty's car was parked in his lot on the day of the accident. Young testified. "I was not acquainted with George Wolf, but I might possibly recognize him if I seen a photograph of him." He said he observed Cooper and Welty during the summer of 1954, and that:

"The boys all exchanged, several different cars, different groups come and meet. * * * After Cooper ceased to ride with them, Welty exchanged with someone and continued to drive to South Bend. He alternated with some other person."

Justice BLACK in his opinion states:

"Plaintiff relies on *Bond* v. *Sharp,* 325 Mich 460. Defendant relies on *Bredeweg* v. *Boyce,* 322 Mich 298; and *Everett* v. *Burg,* 301 Mich 734 (146 ALR 639). One urges that the question of legal relation-

ship between Welty and Wolf is one of law for the court. The other insists that it is one of fact for jury per demand below. Without hesitation, this writer stands for the latter.  * * *

"Holding as I do that the question-of-fact doctrine of *Bond* should apply here, a compelling duty respecting *Everett* remains. The latter, I suggest, cannot be squared plausibly or otherwise with *Bond*. It should not be left at large to confound lawyers and circuit judges further, as it did in the case of *Bond.* I therefore move on this first conference day of the year (March 1, 1956)* that *Everett* be overruled."

In his opinion Justice BLACK gives as reasons why *Everett* should be overruled that "continuing transportation agreements of fellow-employees are not illegal;" that they do not "violate rules of policy or morals;" that the issue is generally one of fact and not of law; and that men should not have to "become coldly dissocial in order that their agreed relationship be or remain effective."

*Everett* v. *Burg,* 301 Mich 734 (146 ALR 639), did not confound this Court when the decision was rendered in *Bond* v. *Sharp,* 325 Mich 460. In the *Bond Case,* this Court said:

" 'But each case must be decided in the light of its own facts; and we think it is always important to ascertain, if possible, what it was that primarily motivated the undertaking.' "

In the *Bond Case* (p 465) this Court referred to the fact that in *Everett* v. *Burg, supra,* 736, we held "that decedent was not a passenger for hire, basing our opinion upon the reasoning found in *Fisher* v. *Johnson,* 238 Ill App 25, 32, wherein the court said:

" 'We regard the circumstances in no different light than if on each occasion when one drove the

---

* This case was decided April 2, 1956.—REPORTER.

other in his car to and from their place of business it was upon an express invitation from the former to the latter to be his guest, and therefore negligence could not be imputed to the latter on the theory that because they were accustomed to exchange courtesies and ride together they were engaged in a joint enterprise or undertaking.'"

In the *Bond Case, supra,* this Court did not, directly or indirectly, take away from the trial judge the right and duty to determine whether evidence had been offered showing that the guest relationship did not exist. To the contrary, the *Bond Case* approved the action of the trial court directing a verdict in the *Everett Case.* In the *Bond Case* (p 466) it was held:

"It is also an established fact that the agreement was not for a single trip, but was to continue so long as the parties were employed in the same factory. The amount of the payment in case either party defaulted on the agreement was definite and approximately the cost of bus fare between the 2 cities. The agreement was not for social purposes, but purely a business arrangement. The benefit accruing to each party as a result of it was the right to demand a corresponding service or to enforce payment of $1 a day for failure to perform. In our opinion the agreement created a passenger-for-hire relationship."

There was no evidence of any agreement between Welty and Wolf except that they were to drive their cars on alternate days. There was no evidence similar to that offered in the *Bond Case, supra,* that if either Welty or Wolf defaulted, the other party was to pay a definite amount.

In *Bredeweg* v. *Boyce, supra,* this Court held that while the plaintiff's declaration alleged that she was accompanying defendant for the purpose of assisting him in driving, said allegation was not supported by proof and, therefore, there was nothing to submit

to a jury on the question of whether the guest relationship did not exist.

The only proof in this record in regard to any arrangement between Welty and Wolf was that they agreed that each one of them would take turns driving on alternate days. There is no evidence that it was their understanding that on the day one would drive the other would not be considered by him as a guest passenger and subject to the guest act. (CLS 1954, § 257.401 [Stat Ann 1952 Rev § 9.2101].)

The principle set forth in *Everett* v. *Burg, supra,* and affirmed in *Bond* v. *Sharp, supra,* 465, that "negligence could not be imputed to the latter on the theory that because they were accustomed to exchange the courtesies and ride together they were engaged in a joint enterprise or undertaking," is a sound principle of law and should be applied to the present case.

Justice BLACK, recognizing the fact that there was no evidence offered as to the passenger relationship existing on the day of the accident or during the week previous thereto, states:

"It is said that the testimony of the two (Cooper and Helwig) should be disregarded—that neither one knew what if any final arrangement existed between Welty and Wolf—and that the allegation of passenger-for-hire relationship consequently fails for want of proof. The contention is answered by an old and valuable presumption—that of continuity (*Ormsby* v. *Barr,* 22 Mich 80, at page 85; *Hensel* v. *Maas,* 94 Mich 563, at page 568; and *Norris* v. *American Steam Pump Co.,* 255 Mich 144)."

None of these 3 cases involved the question as to whether the relationship between the driver of the car and his passenger can be established by the presumption of continuity.

The writer of this opinion has been unable to find any case in Michigan where this Court has invoked

the presumption of continuity in determining as to whether a person was a guest passenger or a passenger for hire. It is doubtful that this Court is desirous of invoking this presumption in this kind of a case, but it is not necessary in the instant case to pass final judgment on that question because of the fact that, even though the arrangements existing between Welty and Wolf one week before the accident were presumed to have continued until the day of the accident, said arrangements did not meet the legal requirement that the proofs disclose by a preponderance of the evidence that Welty was not a guest passenger.

The guest passenger statute provides:

"That no person, transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought." (CLS 1954, § 257.401 [Stat Ann 1952 Rev § 9.2101].)

Plaintiff's failure to offer proof sufficient to submit to the jury that he was not a guest passenger, subjects the question of negligence to the test of gross negligence or wilful and wanton misconduct. The inference of excessive speed, above referred to in this opinion, would not meet this test, as has been disclosed by previous decisions of this Court.

In *Turney* v. *Meyer,* 266 Mich 87, this Court held that gross negligence or wilful and wanton misconduct was not proven by showing that the defendant drove down a hill approaching a curve at a speed of 60 miles per hour against the protest of his guest

passenger and in attempting to make the curve at the bottom of the hill the car skidded, turned over, and injured the plaintiff.

In *LeGroh* v. *Bennett,* 271 Mich 526, the test was not met by showing that the defendant drove his car at 50 to 60 miles per hour on a slippery road, in a heavy fog, when it was dark and rainy, and objects were discernible only a few feet away, and defendant, in attempting to pass a car ahead of him, hit a trailer on the left-hand side of the road.

In *Fink* v. *Dasier,* 273 Mich 416, it was held that driving 70 miles per hour over the protest of the passenger and failing to see a car ahead of him in time to pass, did not constitute gross negligence or wilful and wanton misconduct.

In *Holmes* v. *Wesler,* 274 Mich 655, the test was not met by showing that the defendant drove his car between 70 and 75 miles per hour as he approached a curve and that the car left the road and collided with a telephone pole on the left-hand side of the road.

And in *In re Mueller's Estate,* 280 Mich 203, it was held that proof of a speed of 90 to 100 miles per hour while negotiating a curve was not proof sufficient to meet the test of gross negligence or wilful and wanton misconduct.

The early case of *Alpern* v. *Churchill,* 53 Mich 607, held (syllabus):

"Negligence must be affirmatively proved; but, like other facts, it may be shown by irresistible inference from circumstances."

The more recent cases of *Spiers* v. *Martin,* 336 Mich 613; and *Pattinson* v. *Coca-Cola Bottling Company of Port Huron,* 333 Mich 253, establish the legal principle that while the rule of *res ipsa loquitur* does not prevail in this State, negligence may be inferred from circumstances which place the case with-

in the field of legitimate inference from established facts. These cases also hold that negligence may be established circumstantially when the circumstances are such as to take the case out of the realm of conjecture and into the field of legitimate inference from established facts.

In the present case no irresistible inference from circumstances support plaintiff's claim of negligence. The circumstantial evidence offered by plaintiff did not take this case out of the realm of conjecture and into the field of inference from established facts.

For the reasons hereinbefore stated, the trial court did not err in directing a verdict for the defendant and the action of the trial court is affirmed.

DETHMERS, C. J., and REID, BOYLES, and CARR, JJ., concurred with KELLY, J.