HOPKINS v. LAKE.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
The pertinent facts are viewed from a point of view favorable to
plaintiff on appeal from an order granting defendant's mo-
tion for a directed verdict.

2. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—YOUNG BOY.
A boy 4 years and 10 months of age is too young to be chargeable
with contributory negligence in his action for personal in-
juries.

3. AUTOMOBILES—BACKING—OBSERVATION—CHILDREN.
Common-law standards of care require reasonable observation
by a person backing a motor vehicle, especially where the
motorist knows, or should know, that children are likely to
be affected by such backing.

4. SAME—DUMP-TRUCK DRIVER—NEGLIGENCE—QUESTION FOR JURY.
Whether or not defendant dump-truck driver was guilty of neg-
ligence was a question for jury where he backed up his truck
at speed of 1 mile an hour toward loading crane engaged in
excavation work on premises owned by father of plaintiff, a
boy 4 years and 10 months of age, and who was nearby at
time of injury, and defendant knew child had recently been
in the vicinity; the standard of care of a prudent person
under such circumstances being one of fact.

SHARPE, KELLY, and CARR, JJ., dissenting.

Appeal from Jackson; Boardman (Harry D.), J.
Submitted October 10, 1956. (Docket No. 38, Calen-
dar No. 46,958.) Decided May 17, 1957. Rehearing
denied June 10, 1957.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error §§ 886, 945.
[2] 5A Am Jur, Automobiles and Highway Traffic § 777.
[3, 4] 5A Am Jur, Automobiles and Highway Traffic §§ 396–399.

Case by Thomas R. Hopkins, a minor, by his next friend, Wayne E. Hopkins, against Harry Lake for damages for personal injuries sustained when run over by wheels of dump truck during excavation operations on father's farm property. Directed verdict and judgment for defendant. Plaintiff appeals. Defendant cross-appeals claiming verdict should have been directed at earlier stage of proceedings. Reversed and remanded for new trial.

*Kelly, Kelly & Kelly,* for plaintiff.

*Rosenburg, Painter & Davidson,* for defendant.

KELLY, J. (*dissenting*). Plaintiff (Tommy Hopkins), a boy 4 years and 10 months of age, by his father as next friend, brought this action for damages, claiming that while passing behind defendant's dump truck, defendant placed the truck in motion without making observation and backed into, against and upon plaintiff causing him personal injuries.

Plaintiff appeals from the trial court's order granting defendant's motion for a directed verdict at the conclusion of proofs. Defendant cross-appeals, claiming the court erred in not granting defendant's motions for directed verdict made after the opening statement and again at the conclusion of plaintiff's proofs.

The accident occurred on plaintiff's father's farm. A root cellar was being constructed and a crane operated by Frederick Houghton was excavating the hole and loading defendant's dump truck and another truck operated by Raymond Crisp.

Plaintiff, in company with his father, watched this operation between 9 and 10 o'clock on the morning the excavation commenced and during this period several trips were made from the point of excavation to the point of dump by both defendant's and Crisp's

trucks. Upon returning after dumping, the trucks would drive west of the hole and then back eastward to the excavation for the next load.

About 10 a.m. there was a pause in the work. At this time the empty Crisp truck was backed up to the hole in readiness for another load. Defendant's empty truck was in front of the Crisp truck about 35 to 40 feet to the west of the hole. During this intermission plaintiff's father served watermelon to the truck drivers, the crane operator, and plaintiff's mother and his 2 brothers (a baby 14 months old and John, 7 years of age). This watermelon incident occurred in close proximity to the crane and the Crisp truck.

Plaintiff's mother testified:

"That was when we started to eat the watermelon. The man with the crane was there too. That little incident occupied probably 10 or 15 minutes to the best of my knowledge. At about the conclusion of that time I realized that the crane driver went to go back to his crane, and I realized John wasn't there and that they were going to start work again, so I left to find John. At the time I left to find John, the rest of them were still there—all but the crane driver. Tommy was still there."

Plaintiff's mother also testified that after looking in the chicken house for her son John, she went to the home and there saw plaintiff Tommy filling a pitcher with water from the hose attached to the side of the house. She said:

"From the time I left the group to go to the chicken house and back up to the house, it couldn't have been more than 2 minutes, and at that time Tommy was getting the water at the hose nozzle."

Plaintiff's mother did not see Tommy again until after the accident and offered no further testimony in regard to defendant's negligence.

Tommy's father was plaintiff's only other witness. He testified that "after the watermelon eating" the crane man went to his crane and started filling Crisp's truck and Crisp went over to his truck, but that defendant "didn't go to his truck immediately, —he was talking with me, same place where we were eating watermelon;" that after Crisp's truck was loaded and "at the time Mr. Crisp drove his car out of the loading site my son was no longer there to my knowledge;" that "I believe Mr. Crisp pulled his truck out a matter of a few seconds before I turned and walked to the excavation. Shortly after he (Crisp) pulled out of there I then walked towards the hole. At that time I knew that the Lake truck was up ahead some 35 or 40 feet. I knew that truck was going to be backed up towards the hole to this point where Crisp's truck had been loaded for another load;" that "I watched him (defendant) get in his truck and turned around and went to the hole. I seen him get in his truck. I didn't actually see him start to move the truck;" that about 30 seconds later the accident occurred about 5 or 6 feet to the west of where he was standing and he became aware of the accident when he heard the breaking of glass, evidently when the pitcher broke; that defendant immediately stopped the truck when he hollered and then at his request defendant advanced his truck a few feet disengaging plaintiff from the rear wheels.

Plaintiff's position on the appeal presented to this Court is set forth in his brief, as follows:

"We see no point in extending this brief unduly in argument on the single question presented.

"There was evidence that this 4-years, 10-months-old boy was in the area of defendant's truck operations for an hour and a half prior to the accident, where he could be seen by defendant while defendant was coming and going with his truck; that he was in the little group that gathered during the water-

melon lunch; that he was sent from this group, in the presence of defendant, to get a pitcher of water, which he was to return to the place where they were gathered, and which would take him in the path of defendant's backing truck; that the place where the water supply was and the area between that place and the place to which he was to return were within the view of defendant where he stood before going to his truck, while he was going to his truck preparatory to backing it, and while he was backing it; that within less than 30 seconds from the time defendant went to his truck, the plaintiff, carrying the pitcher of water, was backed over by the right-rear dual wheels;[*] that defendant did not at any time before entering his truck or while backing it look for plaintiff in the direction in which he had gone and where he was, in fact, seen, as testified to by Mrs. Hopkins."

Tommy's father testified that in defendant's presence he asked Tommy to go get water. He was confronted with his signed statement (made 2 or 3 days after the accident) containing the following:

"I don't recall if I sent Thomas to the house for water or if he went on his own. My back was turned towards the house and Harry's truck. I was watching the power shovel. I didn't see or hear Thomas coming back from the house. I didn't know he was around. While standing like this, I heard glass break and turned around and could see that Harry's truck had backed onto Thomas."

Defendant testified:

"Prior to the accident I didn't know that there was any well up near the house. I did not know of any hose up near the well, or any nozzle on the hose. I did not know where water was brought from, if it was brought. * * *

---

[*] Note: The record establishes that the boy was struck by the left-rear dual wheels.

"After this 10- or 15-minute interval when the melon was finished, I do not know what became of Mrs. Hopkins and the baby that she had and Tommy. I couldn't tell where they went. They remained where I was until the melon was done, but I turned and went to my truck. Now, I don't know which direction she went. She went away from the scene of the watermelon. Tommy did. * * * Mr. Hopkins did not to my knowledge tell Tommy to go get a pitcher of water. Tommy was not there when I left. I did not at any time hear Mr. Hopkins tell Tommy in my presence to go get a pitcher of water. I did not know that Tommy had gone any place for any purpose."

Witnesses Crisp and Houghton testified they did not hear the father send the boy for water and did not know he had gone to the house to get water.

Truck driver Crisp testified that after his truck was loaded, as it stood just west of the excavation and north of the crane, he pulled away from the excavation, going west, then northerly, and then easterly, making a circle to go out the driveway; that "as I drove around and through these 2 trees and back onto the driveway, Tommy was not there in this loading area. As I drove my truck out to the driveway, Tommy was not there in that area that I was driving in."

Mr. Houghton testified that he was the operator of the power-shovel crane which had a boom on it extending 30 feet beyond the body of the crane; that the crane faced east and as he operated same he sat on the north side of the crane; that he started work the morning of the accident about 8 o'clock and that up to the time of the accident about 30 loads had been excavated and hauled away; that the watermelon incident occurred west and a little bit north of the crane and in reference to the Crisp truck it would be west and a little south; that "we were stand-

ing around there eating watermelon 10 to 15 minutes. When we finished, Mrs. Hopkins and the children left approximately the same time I did. I believe she went towards the house. I believe Tommy was with her. He wasn't there, anyway. He wasn't there when I began operations of loading the truck;" that he loaded the Crisp truck, requiring about 3 minutes of time and 8 buckets of dirt, and that during this time of loading Crisp was standing alongside of his truck and plaintiff's father was standing south of Crisp's truck and a little west of the crane; that as he loaded the Crisp truck he would swing his crane to the north (in the direction of the house where Tommy got water) and then to the west to dump the load in the truck; that his cab was 1 foot higher than the truck, which allowed him to see over the top of the truck; that as he loaded the Crisp truck and as he commenced operations to load defendant's truck, he did not see Tommy in or near the loading area; that he was in the process of filling the first bucket to place in defendant's truck and was facing east when the accident occurred; that he didn't see it, and the first he knew anything had happened was when he heard plaintiff's father yelling; that at the time the accident occurred "the truck was going very slow; by that, I mean down to a crawl."

Defendant testified that as Crisp's truck was loaded and pulled away from the hole, Tommy was not in the loading area; that he got in his truck (a dump truck with a large steel body on it) and opened the door on the driver's, or left, side, and leaning out the door looked to the east toward the hole to which he was backing; that he could see the loading site as he backed and Tommy was not in the area; that he backed at a speed of about 1 mile an hour; that "as I was backing up I maintained myself in a position looking over my left shoulder to the rear. With my right hand on the steering wheel, left on

the door, holding the door. I maintained that position all the way until I heard the glass break. I was backing that truck up, looking to the east, up to the time I heard the glass break. I did not see anything of Tommy before I heard the glass break. He was not in the line of my vision at all. I have one rear-view mirror on my truck, on the driver's side. Left side. As I am backing my truck up with my head out and looking to the rear I cannot see to the right side of my truck. I could of seen Mr. Hopkins when I was backing. He was to the west of the crane. I did see Mr. Hopkins.  *  *  *  I was approaching within 4 foot of where we loaded when I heard this glass break."

In determining the merits of this appeal, this Court will apply certain principles, namely:

1. The question of contributory negligence is not in the case because plaintiff was too young to be chargeable with contributory negligence. *Guscinski* v. *Kenzie,* 282 Mich 204.

2. Common-law standards of care require reasonable observation by a person backing a motor vehicle, and this is especially true where the person knows, or should know, that children are likely to be affected by such backing. *Kinsler* v. *Simpson,* 257 Mich 7; *Jenkins* v. *Bentley,* 277 Mich 81.

3. In determining as to whether a directed verdict should be granted or not, the unimpeached and uncontradicted evidence produced by the defendant must be accepted. *Christiansen* v. *Hilber,* 282 Mich 403.

4. There must be substantial evidence which forms a reasonable basis for the inference of negligence, and this must be more than a mere possibility that unreasonable conduct of defendant caused the injury. *Poundstone* v. *Niles Creamery,* 293 Mich 455.

The record is silent as to the path Tommy traveled from the house after filling the pitcher to a place

behind defendant's backing truck. Did he travel
the shortest distance between those 2 points, or did
he detour to the right or left because something at-
tracted his childish interests? Did he run or walk
any part of this journey? The record does not an-
swer these questions, because no one who testified
saw Tommy on his return trip from the house.

The house, where Tommy filled the pitcher, was
about 150 feet north of the excavation and there were
trees between the house and the excavation. Counsel
for plaintiff and defendant evidently did not pre-
pare a plat showing location of house, trees and
place of excavation, previous to trial. During trial
a rough drawing was used, and this is incorporated
in the record but is not of substantial value to this
Court.

Appellee, in his brief, refers to this drawing and
states:

"There were a number of trees south of the father's
home and north of the loading site. Defendant's
exhibit E (the drawing) shows the relative location
of these trees, and the location of defendant's truck
prior to its backing to the loading site, and showing
a rectangular area in the southeast corner of the
exhibit which is the excavation, and showing 4 or
5 large evergreen trees 25 to 30 feet tall along the
north side of the excavation. There are roughly 20
trees in the area to the rear of the house."

Plaintiff filed a reply brief and did not controvert
appellee's statement in regard to these trees, but
did state:

"That the hose was about 150 feet north of the
place where the trucks were backing; that between
these points there were only 2 or 3 small maple trees
with high branches, and a person walking under them
could be seen clear to the house."

Mr. Houghton, the crane operator, testified in regard to the trees, as follows:

"I had occasion to look at the number of trees between that well (where Tommy filled the pitcher) and the point where Mr. Lake's truck was parked. I don't know the total. Between 15 and 20 trees, approximately."

Tommy's father testified that defendant's vision toward the house as he walked toward his truck was not obstructed by these trees, because he could see a person walking under them.

Plaintiff's case is based on the theory that there was a path that plaintiff could have traveled from the house to the rear of defendant's truck and that if defendant had looked north to the house as he walked from the watermelon site to his truck, he would have observed the boy approaching the truck. There is no proof that the boy traveled this path.

Defendant's testimony stands uncontradicted that he exercised every precaution a reasonable man could exercise as he looked from his cab toward the rear and as he backed his truck at a speed of 1 mile per hour toward the excavation. Also, there is the testimony of Crisp and Houghton that they did not see the boy just prior to the accident and did not think he was in the vicinity of the loading area.

There was a lack of substantial evidence which formed a reasonable basis for the inference of defendant's negligence, and the trial court did not err in directing a verdict.

Judgment should be affirmed, costs to appellee.

SHARPE and CARR, JJ., concurred with KELLY, J.

BLACK, J. This negligence case presents anew the question whether a verdict for defendant should or should not have been directed on motion below. It

leads directly to the path relocated in *Kaminski v. Grand Trunk W. R. Co.,* 347 Mich 417, and suggests that we read exordially Mr. Justice Cooley's precepts as quoted on pages 420 and 421 of *Kaminski's* report.

Little Tommy Hopkins is the plaintiff in this case. His father is not. The right of action belongs to the boy. The father's lack of care and questioned credibility as a witness, woven as such are into Mr. Justice Kelly's opinion, are of no present moment and do not support an instructed verdict. Tommy is not old enough in this year 1957 to read or comprehend our conflicting views respecting his rights and those of his defendant opponent. That he—along with the profession of today and tomorrow—be enabled some day to appraise such views, these extended presents supporting reversal of the instruction below are placed of record. Like others of his generation, he may wish to inquire how and by what means that that which is cherished by thoughtful men—the right of trial by jury—stood in jeopardy during the decade of his early boyhood.

*First:* This is another case—like *Welty Estate* v. *Wolf Estate,* 345 Mich 408, 416, 417—where the rule of favorable view has been tortured and abused in effort to bolster an instructed verdict for the defendant. The testimony given by Tommy's father, that he told Tommy in defendant's presence to go to the well for a pitcher of water for the men—the favorable-to-plaintiff inference being that defendant knew the little boy would be returning shortly through the danger area with the filled pitcher—, is weighed here by some of my Brothers (yes, on motion for directed verdict) against the father's extrajudicial statement Mr. Justice Kelly has quoted. The testimony of witnesses Crisp and Houghton, plus that of the defendant—that he "did not at any time hear Mr. Hopkins tell Tommy  *  *  *  to go get

a pitcher of water"—, is advanced by them for the
same purpose; that of watering favorable-to-plaintiff
view of the father's mentioned testimony.

This is not all. The undisputed proof that de-
fendant was precedently aware of the danger of that
which ultimately happened, and then failed to act
upon that knowledge when action was fairly and im-
minently indicated, is conveniently overlooked. This
last factor is worthy of special comment, remem-
bering always that we supposedly see—on present
appeal—only that which is favorable to Tommy's
cause. I proceed.

The scene of operations was limited solely to the
farmstead, constituting home of the Hopkins family.
Literally, the operations were carried on in the back
yard of the home. Two small children were known
to be in the vicinity. The older of the 2, John,
strayed away during the watermelon luncheon and
the mother started to look for him. The defendant,
a veteran truck driver, knowing full well that back-
ing vision—from the driver's position in a con-
ventional dump truck—is completely nil save only
as to the limited left side arc, actually warned the
father, earlier that morning, to "watch the little
boy." Yet, when he started to back his truck that
last 35 to 40 feet toward tragedy, he saw and con-
tinued to see the father standing within his (de-
fendant's) limited arc of view, perfectly positioned
to see the entire danger area but facing away from
it. Thus the defendant knew from start of the
backing movement that the child's father was not
doing the very thing he, defendant, had previously
warned the father to do. Defendant was aware too—
on favorable view of course—that the little boy,
theretofore sent from the scene of the watermelon
luncheon on an errand suggesting prompt return

from the direction of errand-departure;* would be apt to enter the very area into which the truck was starting to back. That area—even a small part of it—defendant could not see. All he had to do, before backing farther, was to call the father to attention for a look and a signal. He did not do so, with this result (quotation from father's testimony) :

"What first notified me that an accident had happened I heard the glass break. I turned around north, towards the truck. I see Tom under the wheel. When I turned, the truck was on Tom, and he was looking at me. The mid-section of his body was under the wheel of the truck at that time when I first heard it and turned. He was laying on his stomach and he was looking at me. He had one arm up like this (indicating). I yelled, walked over immediately to him—by him, and yelled at the truck to stop. Then as soon as I told him to stop, the truck stopped and I yelled for him to pull ahead slowly. Before I yelled for him to pull ahead, the truck had proceeded by then when he stopped up onto his shoulders, pushed him the rest of the way down in the ground. He was face down on his stomach with his head and shoulders protruding from the wheel. Back of the wheel his head was. This truck had on dual wheels—that is, 2 wheels on either side of the rear axle, rubber tires. And they were close together, that is, each set of wheels; 2 on one side and 2 on the other, right together. I think there is maybe 2 or 3 inches in between the wheels. There is a groove as the wheels come together, I think there is on dual wheels. When I asked the defendant to pull the truck ahead he did so, and when he started to pull ahead, why, Tom was wedged in between the wheels. He started to follow the wheels around, and I see that and I left him go until

---

* The scene of the watermelon luncheon was straight south of the Hopkins home and the well at rear (southerly) door thereof. It was also south of the ingress route and the backing path, presently described.

his feet was clear, and I yelled to stop again. Then he fell off. His body came up wedged between the 2 left wheels. I yelled for the truck to stop. When it stopped his body fell off."

We may assume that every experienced driver of heavy trucking equipment is or should be aware of imminent danger when he undertakes to back— blindly so far as most of the area of danger is concerned—into or across private property with little children known to be in the vicinity of his intended path. The law so declares at least. In a similar case, where a truck theretofore rented for the purpose of moving an apartment tenant to another location was being backed into position, it was said (*Conroy* v. *Perez,* 64 Cal App2d 217, 224, 225 [148 P2d 680, 684]) :

"As the courts have frequently said, it is ordinarily necessary to exercise greater care for the protection and safety of young children than for adult persons possessing normal and mature faculties. Their conduct is unpredictable and one operating a motor vehicle should anticipate their thoughtlessness and impulsiveness (citing authority). The presence of children is in itself a warning requiring the exercise of care for their safety (citing authority). Moreover if the evidence shows that a driver has knowledge of the presence of children he may be held to have been responsible although it appears that he did not see the injured child in time to prevent the injury (citing authority). This is especially true where the injury occurs in or about the child's home. *Cambou* v. *Marty,* 98 Cal App 598, 603 (277 P 365, 367). The court there said: 'Any reasonable man can be charged with knowledge that a child is apt to be found at any place about the family yard. Charged with that knowledge it becomes his duty to use vigilance and care before setting in motion a dangerous instrumentality in that locality.' "

The supreme court of Vermont, considering another case where an automobile was backed over a 3-year-old boy, adopted from Massachusetts what I think is the right rule for cases of present nature (*Callahan* v. *Disorda,* 111 Vt 331, 338 [16 A2d 179, 182]). I quote:

"In a recent Massachusetts case it was said: 'The backing of any vehicle entails more or less limitation on the view by the driver of the area to be traversed and thus requires corresponding vigilance on his part to avoid causing injury to persons who are known to be, or likely to be, there, whether the vehicle is being backed on a public street or on private land.' *Eaton* v. *S. S. Pierce Co.,* 288 Mass 323, 325 (192 NE 831, 832). * * *

"Whether the defendant, without knowing exactly where the child was when she started to back, but with the knowledge of the child's recent presence nearby and of his likelihood to make sudden and unpredictable actions with which she was charged, acted with the degree of care required by this section,* was, on all the evidence, a question for the jury."

There is no dearth of authority dealing with the question before us. It is annotated exhaustively in 67 ALR 647 and 118 ALR 242, consistent in every respect with Michigan's early declaration (*Detroit & Milwaukee R. Co.* v. *Van Steinburg,* 17 Mich 99, 118) that "As a general rule, it cannot be doubted that the question of negligence is a question of fact and not of law (citing cases)." So far as concerns Michigan law it is recorded in *Guscinski* v. *Kenzie,* 282 Mich 204; *Kinsler* v. *Simpson,* 257 Mich 7; and *Roach* v. *Petrequin,* 234 Mich 551.

*Second:* By means of post-argument correspondence between counsel and our clerk the "rough draw-

---

* The reference is to a section in the Vermont statutes relative to care to be used in turning or backing, now Vt 1947 Stat, § 10,219–xi.—REPORTER.

ing," mentioned in Mr. Justice KELLY's opinion, has
now been interpreted for us. It shows that each
truck, after having entered the Hopkins farm, un-
loaded from the east-west highway, proceeded south
along the farm driveway to a point north of several
pine trees. These trees stood directly north of the
area being excavated and east of the area of danger.
From that point the truck would proceed west—along
a route we will call the east-west path of ingress—
a sufficient distance to permit partial turning and
eastward backing thereof, along another path paral-
lel to and south of the east-west path of ingress,
toward the west end of the excavation. Thus, load-
ing of the trucks was accomplished as each stood
in position with rear thereof backed up to the west
side of the excavation.

The drawing so interpreted shows the danger area
as completely unobstructed. It is bounded north by
the east-west path of ingress, east by the excavation
and the mentioned trees immediately north thereof,
south by the backing path (approximately 35–40 feet
in length), and west by 2 trees. The drawing shows,
also, that the little boy, faithfully clutching the filled
pitcher of water on return from the well at rear of
the Hopkins home, absorbed probably with the won-
ders of an excavating machine at his left, must have
passed from north to south, entirely across the
danger area and in clear view of anyone who cared
to look, before the left-rear wheels of the backing
truck ground him, pitcher and all, into the earth.

The drawing and its interpretation by counsel re-
turn attention to Mr. Justice KELLY's opinion. He
writes that the case is governed by "certain princi-
ples" which I shall quote with comment as follows:

"1. The question of contributory negligence is
not in the case because plaintiff was too young to
be chargeable with contributory negligence. *Gus-
cinski* v. *Kenzie,* 282 Mich 204."

COMMENT: Agreed. No one has raised this question.

"2. Common-law standards of care require reasonable observation by a person backing a motor vehicle, and this is especially true where the person knows, or should know, that children are likely to be affected by such backing. *Kinsler* v. *Simpson*, 257 Mich 7; *Jenkins* v. *Bentley*, 277 Mich 81."

COMMENT: Agreed. The rule of *Kinsler* should be applied as we have previously seen.

"3. In determining as to whether a directed verdict should be granted or not, the unimpeached and uncontradicted evidence produced by the defendant must be accepted. *Christiansen* v. *Hilber*, 282 Mich 403."

COMMENT: This is not a correct statement of the applicable rule. As was said in *Yonkus* v. *McKay*, 186 Mich 203, 210, 211 (Ann Cas 1917E, 458) (citing *Woodin* v. *Durfee*, 46 Mich 424, in support):

"To hold that in all cases when a witness swears to a certain fact the court must instruct the jury to accept that statement as proven, would be to establish a dangerous rule. Witnesses sometimes are mistaken and sometimes unfortunately are wilfully mendacious. The administration of justice does not require the establishment of a rule which compels the jury to accept as absolute verity every uncontradicted statement a witness may make."

The rule just quoted was readopted, with supporting collection of authorities, in *Cebulak* v. *Lewis*, 320 Mich 710, 719 (5 ALR2d 186). At page 721 of report *Cebulak* places *Christiansen*, cited above by Mr. Justice KELLY, in its proper setting with respect to the question before us. Aside from this, I timidly venture observation that defendant Lake's testimony was disputed with respect to the ultimate fact of this case—that of knowledge on his part of the

expectable presence of a little child, in his intended path, when he started blindly backward.

"4. There must be substantial evidence which forms a reasonable basis for the inference of negligence, and this must be more than a mere possibility that unreasonable conduct of defendant caused the injury. *Poundstone* v. *Niles Creamery,* 293 Mich 455."

COMMENT: This is an incomplete statement of *Poundstone's* rule. See page 460 of report (293 Mich), where the complete declaration of the Court ends with full recognition of our rule that "legitimate inferences may be drawn from established facts." Incidentally, *Poundstone* should be interpreted in light of its recent treatment in *Kaminski* v. *Grand Trunk W. R. Co., supra.*

This case of Tommy Hopkins may well be summarized in recent language of the court of appeals of the 6th circuit. Speaking of another Michigan negligence case and the defendant's claimed right to a directed verdict, the court honored *Van Steinburg, supra,* and said:

"Some of us have noted a modern tendency—perhaps a growing one—to give mere lip service to these sound principles. Trial by jury is our established constitutional safeguard against assumption of unwarranted judicial authority and should be honored by steadfast observance rather than discarded by dictatorial breach." *Patterson* v. *Pennsylvania R. Co.* (CCA 6), 238 F2d 645.

Being of opinion that the case before us should have been submitted to the jury to determine whether actionable negligence ought to be inferred, I vote to reverse for new trial.

SMITH, JJ., concurred with BLACK, J.

EDWARDS, J. (*concurring*). The facts have been recited by my Brothers in some detail. We deal

here with plaintiff's appeal from a jury verdict directed against him by the trial judge on defendant's motion. Reviewing such a motion we view the pertinent facts from a point of view favorable to the plaintiff. *Canning* v. *Cunningham,* 322 Mich 182; *Miller* v. *Pillow,* 337 Mich 262; *Gapske* v. *Hatch,* 347 Mich 648.

The defendant truck driver had notice that there were small children in the immediate vicinity of his truck. He got into his truck without prior observation of the entire area behind and proceeded to back up. He did so, leaning out of the driver door and looking back at his left-wheel track. The record does not indicate that any warning was given. He had no rear-view mirror on the right-hand side. He could not see behind the right side of his truck. As he was backing up in this situation, he ran over this small boy with his left-rear wheels.

There is no contributory negligence chargeable to a 4-year-old child. *Guscinski* v. *Kenzie,* 282 Mich 204; *Edgerton* v. *Lynch,* 255 Mich 456.

The standard of care required of drivers backing vehicles in a vicinity where small children are known to be present is higher than that required when only adults are known to be present.

Corpus Juris Secundum says on our present problem:

"The operator of a motor vehicle who knows that a young child is likely to be at any place on private premises has the duty to use due care with respect to such child in backing the vehicle. Whether an operator is negligent in backing a vehicle with resultant injury to a child depends on whether, in the light of existing circumstances and conditions, the operator exercises the care of a reasonably prudent person. Because of the limitation on the view of the area to be traversed in backing, the operation requires corresponding vigilance in order to

avoid injury to a child who is known to be, or likely to be, at the particular place, and increased vigilance in backing may be essential where the operator is chargeable with knowledge of the traits of a child of the age of the injured child or where the operator knows that small children are at play in the vicinity of his vehicle." 60 CJS, Motor Vehicles, § 349, p 822.

See, also, *Roach* v. *Petrequin,* 234 Mich 551; *Kinsler* v. *Simpson,* 257 Mich 7; *Jenkins* v. *Bentley,* 277 Mich 81; and 60 CJS, Motor Vehicles, § 396.

The facts recited above presented a question as to whether or not under the circumstances defendant used the care that a reasonably prudent person would have used. This question was for jury determination. The trial judge was in error in directing a verdict.

I concur with Justice BLACK's reasoning and result.

DETHMERS, C. J., concurred with EDWARDS, J.

VOELKER, J., took no part in the decision of this case.