SHANDOR *v.* LISCHER.

**1. APPEAL AND ERROR—MOTION FOR DIRECTED VERDICT—EVIDENCE.**
Evidence is considered from the point of view favorable to plaintiff when determining whether or not defendants' motion for a directed verdict should have been granted.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error §§ 945, 947.
[2] 4 Am Jur, Assault and Battery §§ 146, 175; 30 Am Jur, Intoxicating Liquors § 609.
[3] 30 Am Jur, Intoxicating Liquors §§ 618, 622.
[4] 30 Am Jur, Intoxicating Liquors § 609.
[5] 30 Am Jur, Intoxicating Liquors § 639 *et seq.*
[6] 4 Am Jur, Assault and Battery § 178.
[7] 1 Am Jur, Actions § 65 *et seq.*
[8] 30 Am Jur, Intoxicating Liquors § 644.
[9] 15 Am Jur, Damages § 309.
[10] 58 Am Jur, Witnesses § 557.

2. ASSAULT AND BATTERY—AGGRESSOR—EVIDENCE.

Evidence presented in civil action for assault *held,* ample to enable the jury to find that defendant bartender was the aggressor and that in the course of the altercation he broke plaintiff's arm.

3. INTOXICATING LIQUORS—FURNISHING LIQUOR TO INTOXICATED PERSON—EVIDENCE.

Evidence, presented in action against liquor licensees by musician whom they had hired to play at the bar for New Year's Eve, that defendants had furnished defendant bartender liquor after he was intoxicated within the meaning of the civil damage act *held,* sufficient to warrant jury finding latter defendant inflicted damages upon plaintiff by reason of the furnishing of such liquor (CLS 1954, § 436.22).

4. MASTER AND SERVANT—SCOPE OF EMPLOYMENT—BARTENDER'S INJURIES TO MUSICIAN.

Defendant bartender's actions in disputing plaintiff musician's pay for playing for New Year's Eve at bar, which took place in the presence of one of the owners *held,* to justify jury in finding that the bartender was acting within the scope of his employment, hence, liability as a result of the master-servant doctrine was properly found for damages plaintiff sustained.

5. INTOXICATING LIQUORS—INTOXICATED BARTENDER—EVIDENCE.

Verdict for plaintiff musician in his action against liquor licensees and their bartender for injuries received and property damage at the hands of the latter while intoxicated *held,* not against the great weight of the evidence which was in conflict (CLS 1954, § 436.22).

6. ASSAULT AND BATTERY—KNIFE WOUNDS—EVIDENCE.

Whether or not plaintiff musician was responsible for knife wounds received by defendant bartender in altercation over payment for entertainment services rendered on a New Year's Eve *held,* for jury under evidence presented, the jury being the trier of the facts (CL 1948, §§ 618.12, 618.22).

7. ACTION—JOINDER OF CAUSES OF ACTION IN ASSAULT AND UNDER CIVIL DAMAGE ACT.

The joinder of an action for assault and battery with statutory cause of action under the civil damage act against the same defendants is proper, as one plaintiff may join in 1 action at law or equity as many causes of action as he may have against the defendant, where the 2 counts arise out of the same altercation, inconsistency, even, not necessarily preventing joinder of counts (CL 1948, § 608.1; CLS 1954, § 436.22; Court Rule No 17, § 6 [1945]).

8. INTOXICATING LIQUORS—INSTRUCTIONS.
  Trial judge's charge to jury in musician's action against liquor licensees and their bartender for personal injuries and property damage, taken as a whole, *held*, not to contain prejudicial error (CLS 1954, § 436.22).

9. PLEADING—AMENDMENT—AD DAMNUM CLAUSE.
  Trial court's allowance of amendment to *ad damnum* clause to conform to proofs adduced *held*, not an abuse of discretion in musician's action against liquor licensees and their bartender for personal injuries and property damage received at hands of latter defendant (CLS 1954, § 436.22).

10. TRIAL—EXAMINATION OF WITNESSES BY COURT—IMPARTIALITY.
  Trial judge's questions addressed to 2 of defendants' witnesses *held*, not to have gone beyond his proper function or to have disturbed the atmosphere of impartiality of the courtroom which he is charged with maintaining.

Appeal from Genesee; Roth (Stephen J.), J. Submitted January 11, 1957. (Docket No. 56, Calendar No. 46,775.) Decided September 4, 1957.

Case by Casey Shandor against Clarence R. Lischer and Vivian Lischer, doing business as Sills De-Luxe Bar, and Robert Henry, under both master and servant theory and civil damage act, for damages arising from assault. Verdict and judgment for plaintiff. Defendants appeal. Affirmed.

*Elza H. Papp* (*Sherman M. Bean*, of counsel), for plaintiff.

*Jennings, Fraser, Parsons & Trebilcock*, for defendants Lischer.

*Brownell, Gault & Andrews*, for defendant Henry.

EDWARDS, J. One of the key questions in this case is: "Did the fiddler hit the bartender with the bass viol?" The bartender claims it all started when he received the first blow on the back of his head

from the scroll of the bass fiddle in the hands of the
fiddler. The fiddler says, however, that he was leav-
ing the premises peacefully with his beloved bass
on his shoulder when the bartender struck him the
first blow on the back of his neck, knocking him down
and inflicting multiple and irreparable fractures up-
on his bass viol. The jury apparently believed the
bass violist.

Some few facts in this case are not in dispute—per-
haps because they are not directly essential to its
decision. Among these are: Casey Shandor, plain-
tiff and appellee herein, inherited the bass viol
from his grandfather. It was, according to Casey,
at the time of its demise, at 4:30 a.m., January 1,
1951, handmade, over 100 years old, and possessed
of a wonderful mellowness of tone.

Casey and 2 of his companions formed an orches-
tral trio which had undertaken to supply festive mu-
sic for the New Year's Eve in question at Sill's De-
Luxe Bar in Flint. The bar was owned and operated
by defendants and appellants Clarence and Vivian
Lischer. Their bartender, also a defendant and ap-
pellant, was named Robert Henry.

All apparently went well at the New Year's Eve
event until closing time at 4 a.m. when the trio
sought its pay. At this point, the 2 versions of this
story diverge. Both versions agree, however, that
after the episode at the door, previously related in
opposite stories, a Donnybrook ensued in the street
outside. Both versions also agree that results in-
cluded not only the damage to the bass viol, but
also Casey Shandor's admittance to Hurley Hospi-
tal with a broken right arm and Robert Henry's ad-
mittance to the same hospital for a 3-stitch repair
to a knife wound in his abdomen. Perhaps need-
less to say, each blamed the other for his own injury;
and each denied causing any to the other.

Either stated or implied in both versions of the case is agreement that the argument over pay started at the bar, that the first blow was struck at the door and that the injuries were inflicted in the fight in the street outside. Both versions likewise seem to imply that plaintiff received his arm injury before defendant Henry was wounded.

Casey sued Robert Henry for the damage to his fiddle and his arm. He also sued the Lischers, claiming they were responsible as employers of Henry and as licensees under the statute establishing liability for furnishing liquor to an intoxicated person who later commits a tort. CLS. 1954, § 436.22 (Stat Ann 1955 Cum Supp § 18.993). A jury before Judge Stephen J. Roth found for plaintiff on both counts and against all 3 defendants in the sum of $5,500. All 3 defendants appeal, claiming 9 grounds for reversal. Three of these pertain to lack or insufficiency of evidence as follows:

Question 2. "If there was no testimony that a tavern owner furnished, sold or gave intoxicating beverages to a person who was at the time intoxicated or that he was intoxicated at the time of injury, are the defendants entitled to a directed verdict of no cause for action as to count 1?"

Question 3. "If there is testimony that the bartender assaulted plaintiff without provocation or that he acted in the course of his employment or that the injury to plaintiff resulted from pulling him off of a person whom plaintiff was injurying (*sic*), were the defendants entitled to a directed verdict of no cause of action as to count 2?"

Question 9. "On the whole record of this cause of action is the verdict contrary to the greater weight of the evidence?"

We assume from an inspection of the declaration that question 2, above, actually refers to count 2 and question 3 to count 1.

In considering whether or not a motion for a directed verdict should have been granted in this case we consider the evidence from the point of view favorable to plaintiff, which the jury apparently found to be truthful. *Butzin* v. *Bonk*, 303 Mich 522; *Gapske* v. *Hatch,* 347 Mich 648; *Maldonado* v. *Claud's Inc.,* 347 Mich 395. The case favorable to plaintiff may be most succinctly set forth in the testimony of the band leader, Rudolph Zaiga:

"*A.* I am a resident of Detroit, Michigan, at the time we were employed on New Year's Eve of 1951. I am a resident now of New York City. I am employed in New York now as a musician. I have an orchestra of my own there at the Russian Inn in New York City.

"Before that New Year's Eve I had worked as a musician for Mr. Lischer at the Sills Bar. I worked just on weekends, Friday and Saturday.

"*Q.* How many Fridays and Saturdays had you worked for Mr. Lischer prior to this New Year's Eve?

"*A.* Six nights; that would be 3 weeks. The first time that I ever went into the Sills Bar, I and the other 2 requested employment.

"On New Year's Eve, I recall after the guests were told to leave, that it was time to quit, making a request of payment for that night. We requested payment from Mrs. Lischer. We asked Mrs. Lischer to pay us, and she was willing to pay us, and then the bartender, Henry, I believe his name was, he somehow said we were not worth it. He said if we are worth double pay on New Year's Eve that he was too; and he threatened to quit. Mrs. Lischer was perfectly satisfied to pay us, until Henry sort of got a little excited. Henry had paid us before on these other week ends. From my observation in working on 3 week ends and New Year's night, I would say he had quite a bit of authority. almost like a boss, I would say. During these nights Mr. Lischer was absent most of the time.

· "I had looked to the bartender, Mr. Henry, for payment. As I said, Mrs. Lischer was perfectly satisfied to pay us and that would be that; but Henry somehow he was under the influence of liquor, by the way, and he got a little excited, he figured we were not worth that much. He figured maybe we were not worth that much, or we were paid double, he should be paid double, and he absolutely demanded we should not get paid that much.

"After that Mrs. Lischer handed some money to Mr. Ballog, and prior to that,—no, I am sorry, before that Henry handed money to Mr. Ballog, and then Mrs. Lischer handed money to Mr. Ballog. In other words, we got our full sum, and then Mr. X or Mr. Poore, whatever you call him, he started grabbing Norman by his collar and demanding he give the money back, and twisted his arms, so naturally Norman handed back the money Mrs. Lischer gave him, and we still had the money Henry gave us.

"After that Mrs. Lischer seemed to be on Henry's side then. She said she did not want to pay that much; and we knew they were all feeling good, so we thought we would come back the next day and talk when they were sober. We were willing to leave and Henry went to let us out of the door, the side door. We were leaving there when the fight occurred. I went out the side door first followed by Mr. Ballog. I was in a position to see Mr. Shandor come out because I turned around. I saw, as Mr. Shandor was leaving, Henry was at the door. He opened the door for us. While Mr. Shandor's back was turned, he had the bass on his shoulder, he gave him a punch back of the neck and he fell down on top of his bass and broke it. After he was knocked down, they tussled for, I would not say longer than a half a minute, and then Mr. Poore came running out very excited and jumped right on top of Mr. Shandor. It was not very long, the whole thing did not last more than 2 or 3 minutes, then I saw Henry get hold of Mr. Shandor's arm and give it a good yank. I actually saw that.

"After that occurred, I had been standing quite near. Right after that yank it seemed to be almost all over and Mr. Shandor seemed to cry out with pain, and we did not want any more trouble so we figured the best thing was to go home and drive away. Casey Shandor could not pick up his bass violin on account of his sore arm, so I picked up his bass violin by one hand, there is a way to grab it in the fiddle (middle?), and I had my violin in my other hand. As we were leaving Mr. Poore came out very excited again, I do not know why, and he wanted to punch me. He took a swing at me. I put up my hand to protect my face and he hit my violin out of my hand. Mrs. Lischer came along and grabbed my violin and started to run back in the establishment. At that moment I laid the bass down on the floor, naturally, I have a valuable violin, I would not want it to get away from me. I followed Mrs. Lischer back into the establishment, and as she went, she went to the kitchen, and I followed her. I noticed she was going through a drawer, and it frightened me, I thought she was going for a gun, so naturally, I left.

"I had not given Mr. Poore any cause to come running toward me to punch at me. I did not talk to Mr. Poore. I talked to Henry, the bartender, and to Mrs. Lischer.

"From there we went to the police station because I was worried about getting my violin when she did not want to give it back to me and with Mr. Shandor. he wanted to get into a hospital, he was in need of care.

"I was in a position to observe Mr. Henry during the evening, Mr. Lischer, Mrs. Lischer and Mr. Poore.

"Q. Would you please tell us from your observation, in what physical condition each of these people were? What about Mr. Lischer?

"A. Mr. Lischer was definitely under the influence.

"Q. Had you seen Mr. Lischer under the influence of intoxicating liquor on any other occasion?

"*A.* Yes, in fact, right now in this courtroom is the first time I have seen Mr. Lischer not under the influence of liquor.

"I have worked in taverns for 8, 9, or 10 years where liquor is sold. I think I can tell the difference between a sober person and a person under the influence of liquor. Mrs. Lischer was under the influence of liquor too. I saw her drinking, especially with Henry and Mr. Poore, and one time Henry and Mrs. Lischer had a few dances together. Mr. Poore, this customer, was definitely under the influence of liquor. I was in a position to see whether he was buying drinks, because we were playing right near the bar. The bar was not more than 4 feet away from where we were playing.

"*Q.* What about Mr. Henry's condition? What was his condition?

"*A.* I am afraid definitely too, under the influence of liquor. As a matter of fact, it seemed as though everybody was drinking. I would not say everyone who was working there. I know the orchestra was not, because I made it definite. I am a leader of the orchestra, and where I am working together I make it definite I do not want my men to drink. I was hired to play and not to drink.

"I observed that Mr. Henry was under the influence of intoxicating liquor and he was drunk about 12 midnight. After I noticed his condition of being under the influence of liquor, I noticed him continue to drink after he already was drunk.

"I have played musical instruments since about the age of 6, I guess. I had a valuable violin. It was damaged in the scuffle. I have known Mr. Shandor for quite some time and I know the type of bass violin he has. It is of Italian make that is the rarest and finest musical instrument. I would say it was a hundred years old and over. Being a musician I would know what the instrument is supposed to be worth.

"*Q.* What would a good valuable instrument be worth, in the line of melody, and so forth?

"*A.* I tell you the difference. If you would take a new bass, we are talking about a bass, you could buy a complete new bass, you would just have a bass in its form, and you would hardly get any tone out of it, no response, there would be no depth. That would be a musical term I am talking about. Such an instrument I talk about, would not have depth and mellowness, and so forth.

"*Q.* How much would you have to pay for an instrument like that?

"*A.* From $500 to $700. That would be a factory instrument too, and they are not like the masters made. This instrument Mr. Shandor had was a hand-made instrument.

"*Q.* From the fact that it was an Italian made instrument, and an old instrument, in your opinion, basing it on the value of a new instrument, what would you say it was worth?

"*A.* An instrument of that sort, in my opinion, would be worth from $3,000 to $4,000.

"*Q*: After you saw Mr. Henry intoxicated, did you see Mrs. Lischer or anyone else serve him a drink?

"*A.* No, I did not see him get a drink because Henry was the bartender, and he had occasion to take his own. I saw him take his own. He drank with the customers. I did not see Mrs. Lischer hand him a glass to drink, or the waitress, but I did observe him serve himself."

The record indicates that plaintiff's weight was 115 pounds. Defendant Henry's weight is not given —but the jury saw him. There is ample evidence from which the jury could have found that defendant Henry was the aggressor in this altercation and that in the course of it he broke the little musician's arm. The jury apparently did not believe defendants' stories of provocation by being hit first by plaintiff's bass viol. Defendant Henry certainly was not entitled to a directed verdict.

On the basis of the testimony quoted, the question as to whether defendant Henry was intoxicated by

midnight and continued thereafter to drink defendants Lischer's liquor was for the jury to determine. We believe that there was competent evidence from which the jury could have found that defendant Henry inflicted the injuries complained of by plaintiff by reason of the furnishing to him of liquor by defendants Lischer after he was intoxicated within the meaning of the statute referred to. (CLS 1954, § 436.22 [Stat Ann 1955 Cum Supp § 18.993].) *Butzin* v. *Bonk, supra; Hylo* v. *Michigan Surety Co.,* 322 Mich 568.

· The authorities relied upon by appellants on this point are patently not applicable. *Wyatt* v. *Chosay,* 330 Mich 661; *Juckniess* v. *Supinger,* 323 Mich 566; *Malone* v. *Lambrecht,* 305 Mich 58. The first 2 turn upon failure of proof of intoxication. The third presents a wholly different fact situation.

The testimony quoted also was sufficient to sustain the jury finding of liability as a result of the master-servant doctrine. This dispute developed directly from the business of the master—the liquor licensees. It originated in an argument over pay owed by the master (the Lischers) to plaintiff. Defendant Henry's actions took place in the presence of Mrs. Lischer and apparently with her sanction. There was ample evidence from which the jury could have found that defendant Henry was acting within the scope of his employment. *Guipe* v. *Jones,* 320 Mich 1; *Stewart* v. *Napuche,* 334 Mich 77.

As to appellants' ninth question, we do not find support for their contention that the jury verdict was against the great weight of the evidence. Plaintiff and all of his witnesses presented testimony which tended to confirm that quoted from the leader of the musical trio. The conflicting stories of the defendants merely provided issues of fact which were proper for jury consideration.

We note, of course, that defendant Henry suffered the most hazardous attack of the event. But, as noted, this apparently took place after plaintiff's arm was broken and the jury apparently believed plaintiff's denial of responsibility for the knife wounds as they did his denial of responsibility for the original blow. Under our system of laws the jury is trier of the facts. CL 1948, § 618.12 (Stat Ann § 27.992); *Detroit & Milwaukee R. Co.* v. *Van Steinburg,* 17 Mich 99; *Wight* v. *H. G. Christman Co.,* 244 Mich 208.

We turn now to appellant's question 1:

"Can a common-law cause of action of assault and battery be joined with a statutory cause of action under the civil damage act (CLS 1954, § 436.22 [Stat Ann 1955 Cum Supp § 18.993])?"

We believe, as did the trial judge, that the joinder of plaintiff's cause of action on the master-servant theory with his statutory cause of action under the civil damage act was proper. It is specifically authorized by the joinder statute, the applicable portion of which we quote below:

"The plaintiff may join in 1 action at law or in equity as many causes of action as he may have against the defendant." CL 1948, § 608.1 (Stat Ann § 27.591).

See, also, *Hogsett* v. *Ellis,* 17 Mich 351; *Creen* v. *Michigan Central R. Co.,* 168 Mich 104 (Ann Cas 1913C, 98); *Struble* v. *Republic Motor Truck Co.,* 216 Mich 299 (21 NCCA 138).

The 2 counts of plaintiff's declaration were based on the same altercation. We find no inconsistency between them, although that in itself would not necessarily mean misjoinder. Michigan Court Rule No 17, § 6 (1945). We have recently considered and decided that under the civil damage act, suit may be brought jointly against both the intoxicated

person and those who furnished the intoxicants. *Ruediger* v. *Klink,* 346 Mich 357.

We have reviewed with care the other 6 of appellants' questions on appeal. Taking the trial judge's charge as a whole we find no prejudicial error. Nor do we believe he abused his discretion in allowing amendment of the *ad damnum* clause to conform to the proofs. CL 1948, § 616.1 (Stat Ann § 27.838.) Nor do we believe that the trial judge's questions addressed to 2 of defendants' witnesses went beyond his proper function or disturbed the atmosphere of impartiality of the courtroom which the trial judge is charged with maintaining. See *People* v. *Cole,* 349 Mich 175.

For reasons stated, the judgment of the trial court is affirmed. Costs to appellee.

DETHMERS, C. J., and SHARPE, SMITH, VOELKER, KELLY, CARR, and BLACK, JJ., concurred.