JOHNSON *v.* NEW YORK CENTRAL RAILROAD COMPANY.

RAILROADS—GASOLINE TANK TRUCK AND TRAILER—CONTRIBUTORY
NEGLIGENCE—EQUALLY DIVIDED COURT.
  Directed verdict and judgment for defendant railroad company
  in action by truck driver for personal injuries received when
  his tractor and trailers, loaded with 7,890 gallons of gasoline,
  were struck at railroad crossing is affirmed by a court equally
  divided as to whether or not plaintiff was guilty of contributory
  negligence as a matter of law under circumstances presented
  (CLS 1956, § 257.669).

Appeal from Jackson; Hartrick (George B.), J.,
presiding. Submitted October 14, 1958. (Docket
No. 45, Calendar No. 47,396.) Decided July 13,
1959. Rehearing denied October 12, 1959.

Case by George E. Johnson against the New York
Central Railroad Company, a Michigan corporation,
for personal injuries sustained when gasoline truck
was struck by passenger train. Directed verdict and
judgment for defendant. Plaintiff appeals. Affirmed by an equally divided court.

*Alexander, Cholette, Buchanan, Perkins & Conklin* (*Edward D. Wells,* of counsel), for plaintiff.

*McKone, Badgley, Domke & Kline* (*Maxwell F. Badgley,* of counsel), for defendant.

REFERENCES FOR POINTS IN HEADNOTES
3 Am Jur, Appeal and Error § 1160.

Kavanagh, J. (*for reversal*). Plaintiff brought this action to recover from defendant railroad company for personal injuries suffered when defendant's passenger train collided with plaintiff employer's tractor and trailers loaded with 7,890 gallons of gasoline. This equipment was being driven by plaintiff in a westerly direction over an angle crossing known as Rex or White's Crossing, about 8 miles east of Kalamazoo, where defendant's railroad tracks intersect US–12A.

The accident occurred about 2 p.m., on a bright chilly day, on November 30, 1951.

Plaintiff alleged in his declaration that the defendant's employees were negligent in operating and causing to be operated its train at a high and reckless rate of speed; that defendant was negligent in maintaining a dangerous and hazardous crossing; that defendant's employees negligently failed to warn plaintiff of the approach of defendant's Mercury passenger train from the east although they were aware it was due; that defendant's employees were negligent in that they placed a switch engine at the intersection which activated the warning signals at the crossing; that defendant negligently failed to station a guard at the intersection.

Plaintiff's declaration further alleged that defendant's engineer on the Mercury passenger train was negligent in releasing the brakes on the train at a time when the engineer knew or should have known that in so doing a collision would result; that defendant's train failed to avoid a collision with the vehicle operated by plaintiff when the same could have been done with the use of ordinary care. Plaintiff further averred that he had exercised reasonable and proper care; that he was not guilty of negligence contributing to the accident; and that defendant employees' negligence was the proximate cause of the accident and his resulting injuries.

Defendant by answer denied negligence on the part of its employees and alleged that plaintiff was guilty of contributory negligence in that plaintiff had failed to make proper observation before attempting to cross the railroad tracks.

Defendant urges that plaintiff failed to comply with Michigan public service commission rule No 43, which provides as follows:

"No driver of any motor vehicle under certificate or permit from this commission, shall drive such vehicle across railroad tracks at grade without first bringing the vehicle to a full stop and shall not proceed until he shall have determined that it is safe to cross." (1954 Administrative Code, No R 460.122, p 5631.)

Defendant further urges that plaintiff failed to comply with CLS 1956, § 257.669 (Stat Ann 1952 Rev § 9.2369), which provides as follows:

"(a) The driver of any motor vehicle carrying passengers for hire, or of any school bus carrying any school child, or of any vehicle carrying explosive substances or flammable liquids as a cargo or part of a cargo, or any motor vehicle weighing over 10,000 pounds, including the load thereon, before crossing at grade any track or tracks of a railroad, shall stop such vehicle within 50 feet but not less than 10 feet from the nearest rail of such railroad and while so stopped shall listen and look in both directions along such track for any approaching train, and for signals indicating the approach of a train, except as hereinafter provided, and shall not proceed until he can do so safely. After stopping as required herein, and upon proceeding when it is safe to do so the driver of any said vehicle shall cross only in such gear of the vehicle that there will be no necessity for changing gears while traversing such crossing and the driver shall not shift gears while crossing the track or tracks.

"(b) No stop need be made at any such crossing where a police officer or a traffic-control signal directs traffic to proceed."

Defendant contends that plaintiff violated this statute and public service commission rule and was, therefore, guilty of contributory negligence as a matter of law.

The case was tried before a jury for nearly 3 days. At the conclusion of plaintiff's proofs defendant moved for a directed verdict on the grounds that: (1) no negligence on the part of defendant had been proved; (2) under the record as it then stood plaintiff was guilty of contributory negligence as a matter of law; (3) there was no evidence of any kind which would justify submitting the question of subsequent negligence to the jury.

The trial judge, apparently agreeing with all 3 reasons, directed a verdict of no cause for action and judgment was entered accordingly. From this judgment plaintiff makes his appeal to this Court on 3 grounds:

(1) Is there a question of fact for the jury as to whether the defendant was guilty of negligence on the following issues:

(a) Whether the passenger engineer of the defendant used due care and caution under the circumstances then and there existing;

(b) Whether the crew on the switching locomotive, which was standing near the crossing activating the flasher signal, used due care and caution under the circumstances then and there existing?

(2) Is there a question for the jury whether the passenger engineer was guilty of subsequent negligence under the circumstances then and there existing?

(3) Is there a question for the jury whether plaintiff was guilty of contributory negligence under the circumstances then and there existing?

The law is well established that on an appeal from a directed verdict in favor of the defendant at the conclusion of plaintiff's proofs the testimony must be viewed in a light most favorable to the plaintiff.

In *Hammerbacher* v. *Babechenko,* 348 Mich 139, 150, the Court said:

"Testimony and all legitimate inferences therefrom must be viewed in the light most favorable to plaintiff in determining whether denial of defendant's motion for directed verdict was proper— *Douglas* v. *Holcomb,* 340 Mich 43."

In *Levesque* v. *LaFortune,* 348 Mich 443, 445, the Court said:

"In appeal from judgment entered for defendants under the statute, as here, we are bound, however, to view the testimony in the light most favorable to plaintiff and to draw the reasonable inferences therefrom which are in his favor. *Warwick* v. *Blackney,* 272 Mich 231; *Paw Paw Depositors Corp.* v. *John W. Free State Bank,* 278 Mich 637; *Poundstone* v. *Niles Creamery,* 293 Mich 455; *Longfellow* v. *City of Detroit,* 302 Mich 542; *Savas* v. *Beals,* 304 Mich 84; *Routhier* v. *City of Detroit,* 338 Mich 449 (40 ALR2d 1114)."

In *Wadsworth* v. *New York Life Insurance Company,* 349 Mich 240, the syllabi read:

"1. The Supreme Court examines the record on appeal from directed verdict and judgment for defendant at close of plaintiff's case to see whether there was competent evidence from which the jury could have found for plaintiff.

"2. A jury may draw reasonable inferences from the established facts and circumstances, in the absence of direct proofs."

See, also, *Lane* v. *B & J Theatres, Inc.*, 314 Mich 666; *Michigan Fire & Marine Insurance Co.* v. *Pretty Lake Vacation Camp, Inc.*, 316 Mich 197; *Cole* v. *Austin*, 321 Mich 548; *Greenberg* v. *Greenberg*, 337 Mich 390; *Hopkins* v. *Lake*, 348 Mich 382; *Stewart* v. *Eldred*, 349 Mich 28; *Indiana Lumbermens Mutual Insurance Co.* v. *Matthew Stores, Inc.*, 349 Mich 441; *Shandor* v. *Lischer*, 349 Mich 556.

In light of these decisions, it is necessary to relate at some length facts the proofs developed during the course of the trial in order to properly understand a disposition of the questions presented in this case.

At the time and place aforementioned plaintiff was driving his tractor and equipment over an angle railroad crossing. The equipment was loaded with 7,890 gallons of gasoline that was to be delivered in Kalamazoo. The over-all length of the equipment from the front bumper to the rear bumper of the 4-wheel trailer was about 50 feet, and the equipment was about 8 feet wide.

Plaintiff had left a plant at Jackson, Michigan, and followed US–12, branching off on US–12A near Comstock, and approached the railroad tracks on a highway which runs parallel to the tracks, crosses the tracks at an angle in a northwesterly direction, and then runs to the west again parallel to the tracks.

Plaintiff approached the crossing from the east. When about one block east of the crossing he noticed the crossing signal flashers blinking. He coasted up and stopped his equipment with the front end about 15 feet from the planking of the tracks. At this particular crossing there are 2 sets of rails and the distance from outer rail to outer rail is 41 feet. It is a distance of 58 feet on the angle from the most southerly rail to the most northerly rail. From the place where the truck stopped, it would have to travel a distance of about 128 feet (5 feet plus 15 feet plus 50 feet plus 58 feet equals 128 feet)

before the rear would clear the northerly rail, and about 133 feet for it to clear the planking along the north edge of the rail. This distance is computed as follows: 5 feet of planking; 15 feet from place stopped in back of planking; length of equipment: 50 feet; crossing: 58 feet.

When plaintiff pulled up and stopped he noticed the flasher lights blinking and heard the bell ringing. While stopped he noticed a switch engine about 100 to 150 feet away on the south main track. He noticed traffic coming from the opposite direction, which would stop, observe the situation, and then pull across the crossing. He sat there wondering which way the switch engine was going to go or how long it was going to be there. From the driver's seat in the truck he could not see down the track to the right, or east, because of the angle in crossing. Finally he pulled the hand brake that sets the whole unit to keep it from rolling backwards or moving, moved over to the opposite side of the truck, stuck his head out the right window and looked all the way up the track. He could see east to the curve approximately 5/10 of a mile away and there was no train approaching in that distance. He then got back underneath the wheel, released the brake, put the truck in second gear, which is the fast accelerating gear from a standstill, and started. From the time he took his eyes away from the view to the east and started up, he estimated the time would be 3 to 5 seconds. Having looked to the east and having seen no train approaching, he reasoned the switch engine to his left was activating the bell and flasher lights. As he approached near the middle of the tracks, the switch engine started blowing its whistle and he watched the switch engine wondering what it was going to do. He knew it was evidently signaling to make a move one way or the other. He continued across the crossing, accelerating his speed

as much as he could.  His tractor and semitrailer were completely off the crossing when the train, approaching from the east on the north track, hit his 4-wheel trailer.

Two witnesses who were driving trucks in the opposite direction and approaching the crossing from the west saw the accident.

Witnesses Kelly and Northrup both saw plaintiff slide over in his truck, put his head out the window and look east before starting.  They testified they were both in a position to see up to the curve at that point and the Mercury train was not in sight.

Bernard Kelly testified that the left rear wheel of the 4-wheel trailer was on the north rail of the westbound track when struck by the train.

William Northrup stated the 4-wheel trailer was almost clear, just the back axle of the 4-wheel trailer was on the track.

When struck the truck gave a big lunge forward, the front axle of the 4-wheel trailer and the back axles of the semitrailer came off the ground and doubled up.  The 4-wheel trailer then went over backwards and exploded.

Plaintiff had crossed the crossing 4 to 6 times during a 3-year period.  He did not know the passenger train was due.

Witness Kelly testified that he had crossed the crossing many times before, approximately 500 to 1,000 times, and on numerous occasions had observed the switch engine working in that area and the flashers would be operating, and traffic, after making an observation, would make the crossing.

On the day of the accident the switch engine had been switching the Rex Paper Mill, which is located just west of the crossing 300 or 400 feet on a branch track.  The switching engine had been on the main eastbound tracks switching for 10 or 15

minutes prior to the accident and during all that time the flashers were working at the crossing.

The engineer and fireman of the switch engine, at the time they were sitting there, knew that the Mercury passenger train was due. The engineer of the switch engine called the attention of the fireman to the truck and said: "Watch out for 355." The fireman testified that he first saw the truck when the front of the truck was just about on the east-bound tracks and the passenger train was about 800 feet away from the crossing. The switch engine engineer blew the switch engine whistle 6 or 8 times in short blasts and then called to the fireman to jump. The fireman remained in the cab until the impact.

The engine on the passenger train was a diesel. The switch engine fireman heard no horn on the diesel although he was sitting on the left of the switch engine with the left window down. Plaintiff, whose window was down on the right side, heard no horn blow on the diesel. He did hear the whistle on the switching steam locomotive and he would swear that the diesel wasn't blowing.

Witnesses Kelly and Northrup both testified they did not hear the diesel horn as they approached the crossing.

Mr. Cole, the engineer of the passenger train, testified he blew the horn several times. He further testified that he had been traveling about 81 miles per hour; that before reaching Rex Crossing there are 2 curves, one through Comstock and one 2,200 feet east of the crossing. His first view of Rex Crossing was 2,200 feet east of the crossing. There was a slow board sign 638 feet east of the crossing. The rules require the train speed must be reduced to 65 miles per hour at the sign. He had applied the service application of the brakes about 3,500 feet before the crossing. It was testified that

there is a time lag of 8 to 10 seconds between application of the service brakes and their taking effect.

The Mercury diesel engine contained a speed recorder tape, which records automatically as the locomotive moves along the tracks the speed of the locomotive, the miles per hour, any stops, and the point of application of the brakes.

Defendant's employee Carlton S. Hulbert testified the recording tape disclosed that the service brakes became effective about 2,600 feet east of the crossing. The tape further disclosed that from 81 miles per hour at 2,600 feet from the crossing the train was going 79 miles per hour at 2,200 feet, 77 miles per hour at 2,000 feet, 73 miles per hour at 1,600 feet, 69 miles per hour at 1,200 feet, 65 miles per hour at 800 feet. During the space of travel from 2,000 feet to 750 feet east of the crossing there was only service application of the brakes of 15 pounds. The rate of deceleration during the entire time was 1 mile per hour in each 100 feet. The effect of the brakes was released 750 feet east of the crossing, and at that point the train began coasting and coasted while the engineer was changing from service application of the brakes to emergency application. During this distance the usual time lag between application of the emergency brakes and the taking effect took place.

The tape disclosed that when the engine reached 400 feet from the crossing the emergency application took place. The train thus coasted without effective brakes for a distance of over 300 feet.

The engineer on the passenger train testified he knew that the truck was loaded with inflammable liquids when he first saw it. He further testified that he could have slowed up more if he had kept his brakes applied. The engineer further testified that if he had applied the brakes effectively at a

point 2,200 feet away that he could have brought his train to a complete stop before it reached the intersection, or slowed down so that it would have been close to a stop if the brakes had been on emergency.

Defendant's engineer Cole further testified that as he came around the curve at about 2,200 feet east of the crossing he noticed plaintiff's truck stopped some distance back from the south track and he did not expect it to start up and cross the tracks in front of him. He further testified that he did not make any move to apply the emergency brake power until after he realized the truck was going to cross; that he then frantically blew the diesel horn and switched to the emergency brakes, but that it was then too late to avoid the accident.

Defense counsel admits that, according to the speed tape which was in evidence, the train was in view from 2,600 feet or 25.4 seconds before arriving at the crossing.

It is the contention of defendant railroad company that plaintiff is guilty of contributory negligence as a matter of law for having violated both the statute and the public service commission rule by proceeding before he could safely do so, and because it is not affirmatively disclosed that plaintiff not only looked but listened in compliance with the statute and the rule.

The trial court in granting the directed verdict, and in holding plaintiff guilty of negligence for violation of the statute, said:

"Now, under such circumstances, with the ringing of the bell and the flashing signals, he had no right to assume or to take it for granted that the flashing of the signals or the ringing of the bell was occasioned by the switch engine. Also, in the testimony, there is some indication that he may have looked but he did not fully comply with the statute as far as the testimony is concerned as to listening; and I think,

because of the very fact that this statute is on the books and is made to cover a situation such as we have here, that his superficial approach to the problem in the light of the statute, in the light of his testimony taken in its most favorable light, warrants the court in finding that he violated the statute and was guilty of negligence in that regard as a matter of law.

"I also am of the opinion that there was sufficient distance between the crossing and the point where the train could be observed when the plaintiff approached the crossing that, by making a proper observation, by making the observation of an ordinarily prudent person, especially carrying the load of cargo that he was carrying and which he was well aware that he was carrying, would require him to make a more careful observation and the train was there where he could have observed it and, by the proper approach to the crossing and by the proper observation of the ordinarily prudent person charged with the responsibility of the situation there at hand, the accident would not have happened; and, as a matter of fact, he should have seen what was there to be seen, and that he again must be found, because of such failure, guilty of negligence as a matter of law."

We believe that, under the circumstances in this case, a question of fact arose for the jury to decide whether or not a reasonably prudent person, under the circumstances in this case, would have reached the same conclusion reached by plaintiff.

The duty imposed by the public service commission rule and by the statute appears to be a restatement of the common-law rule with respect to negligence, that is, a person is required to use that degree of care which an ordinarily prudent person would use under the same or similar circumstances.

A much higher degree of care would be required of the plaintiff in this case since he was driving a

truck transporting 7,890 gallons of highly inflam-
mable gasoline; a truck that because of its size was
slow in acceleration; a crossing that was not only
at an angle to 2 sets of tracks, but provided a poor
view to the east. These were all circumstances
which must necessarily be taken into consideration
in arriving at the question of whether a reasonably
prudent person would have acted as plaintiff did
under these circumstances. Neither the common-law
rule nor the statute prohibits him from passing
over the crossing. In order to form an opinion that
he may do so with safety, which is the statutory
duty, he must take into consideration all of the facts
we have just enumerated. If reasonable minds
would differ as to whether he acted in a reasonable
manner in view of all of the circumstances, we be-
lieve, a jury question is raised.

There is a dispute in the testimony of engineer
Cole, plaintiff, and witnesses Kelly and Northrup
as to whether the passenger train was in view when
the truck started across the tracks. Engineer Cole
testified it was; the other 3 testified it was not. The
physical facts seem to support the plaintiff. After
looking east plaintiff spent 8 seconds before he began
to move: 5 seconds looking at the switch engine and
3 seconds moving back under the wheel before get-
ting under way.

There was testimony that the average speed of
plaintiff's vehicle during the crossing was about 3
miles per hour. At an average speed of 3 miles
per hour, it would take plaintiff's vehicle 28 seconds
to travel 128 feet in order to clear the northbound
rail. Since all of the testimony seems to indicate
the rear of the truck was about to leave the north-
bound rail, and since some 36 seconds had inter-
vened since plaintiff, Kelly and Northrup were look-
ing to the east, it is a reasonable deduction that the

train had not as yet come in sight.   At least reasonable minds might differ as to whether or not the train was actually in sight at the time plaintiff made his observation.

A jury could reasonably infer that during the entire time in which defendant's train was traveling 2,200 feet approaching the crossing plaintiff's gasoline truck was already moving forward on the crossing.   Under these facts and circumstances, it is at least a question of fact for the jury to decide whether plaintiff was guilty of contributory negligence. Defendant's engineer did not apply his emergency brakes until approximately 640 feet east of the crossing when, as he stated, it became obvious to him that the truck was not going to stop, even though when he rounded the curve 2,200 feet east of the tracks he testified he saw plaintiff's long gasoline truck.   He also saw and knew the switch engine standing on the south main tracks was activating the flasher signals.   He also knew that highway US-12A crossed the tracks on an angle in a northwesterly direction, making it difficult for the driver to see to the east.   Despite all of this information, rather than applying the emergency brakes immediately, he simply applied the service brakes and then during the last few seconds switched to the emergency brakes.   Since reasonable minds might differ as to whether his actions constituted reasonable care and caution under these circumstances, we feel a question of fact for the jury was created.

It is not necessary to restate the rule laid down in *Davis* v. *New York Central R. Co.*, 348 Mich 262, or the authorities therein cited by Justices CARR and BLACK.   References made in both opinions in the *Davis Case* are in support of our finding in this case.

Under the proofs in the case at bar, opinions may well differ, not merely as to the facts, but as to the inferences to be drawn from the facts.

. Whether plaintiff failed to exercise proper care for his own safety involves consideration of the circumstances attending the accident. The same situation is true with reference to the alleged negligence of defendant's employees.

We conclude that the issues in this case should have been submitted to the jury.

The judgment should be reversed and the cause remanded for new trial. Appellant should have costs.

DETHMERS, C. J., and CARR and VOELKER, JJ., concurred with KAVANAGH, J.

SMITH, J. (for affirmance). Another intersection accident is before us, this time involving a fast railroad passenger train and a train of vehicles carrying gasoline. We need not restate the facts. Nor need we enter upon a lengthy discussion of the common-law standard of care or the degree of care necessary to be exercised thereunder. All of this we have discussed recently and at some length.

The key to this case is the statute set out in full in the margin hereof.* It concerns a compounding of hazards, those of the railroad crossing with those of certain classes of cargoes. The hazard of the

---

* "The driver of any motor vehicle carrying passengers for hire, or of any school bus carrying any school child, or of any vehicle carrying explosive substances or flammable liquids as a cargo or part of a cargo, or any motor vehicle weighing over 10,000 pounds, including the load thereon, before crossing at grade any track or tracks of a railroad, shall stop such vehicle within 50 feet but not less than 10 feet from the nearest rail of such railroad and while so stopped shall listen and look in both directions along such track for any approaching train, and for signals indicating the approach of a train, except as hereinafter provided, and shall not proceed until he can do so safely. After stopping as required herein, and upon proceeding when it is safe to do so the driver of any said vehicle shall cross only in such gear of the vehicle that there will be no necessity for changing gears while traversing such crossing and the driver shall not shift gears while crossing the track or tracks." (CLS 1956, § 257.699 [Stat Ann 1952 Rev § 9.2369].)

railroad is a matter of common knowledge. The trains travel at high speeds on fixed tracks. They cannot maneuver or dodge. Their momentum is such that their stop must be slow and gradual. Their force of impact is such that disaster inevitably follows collision, and may well involve the passengers on the train as well as those in the object struck. There is no need to belabor the obvious. All of this was established as early as *Lake Shore & Michigan Southern R. Co.* v. *Miller,* 25 Mich 274. And the dangers have worsened since that time, not bettered.

Since tragedy upon impact is almost inevitable, our people have required the protection of various devices, bells, lights, barriers, watchmen, and, more recently, the extensive use of underpasses and overpasses. In addition, with respect to the crossing of railroad tracks by certain classes of vehicles (those carrying school children, those carrying explosives, and those carrying flammable liquids) our statutory law commands the most extreme precautions. Whether the common law itself, without statute, would or would not be equally demanding, in view of the hazard, is not material. We have the statute. It requires that the drivers of such vehicles shall stop within so many feet of the track, while stopped shall listen and shall look ("in both directions") not only for trains but for signals. Only then, having determined that it is "safe" to proceed, may the vehicles move and, so great was the legislative concern as to this particular situation, it is provided that the gear used in crossing shall be such that it need not be changed in crossing the tracks and the driver is commanded not to do so.

We have, thus, a statutory requirement of care the most exacting and diligence the most demanding. Why? Because of the potentialities for holocaust. The collisions between private car and pedestrian,

or car and car, tragic though they are, normally involve only the immediate principals, with occasional guests. But the gasoline-laden trains of vehicles traversing our highways with their explosive and vulnerable cargoes are an ever-present hazard to all who travel and nowhere is the danger more acute than at the railroad intersection. At such crossings, where collision is sought to be prevented by statute not only between trains and vehicles carrying gasoline or explosives, but between trains and school buses, there exist, constantly, possibilities of appalling disaster. Endangered are not only those in the vehicle but those on the train. The statute must be interpreted by us in the light of its evident intent and for the accomplishment of its obvious purpose, the prevention of mass incineration and slaughter.

In this situation, then, governed by the quoted statute, we rule upon the case of a driver of a train of vehicles carrying thousands of gallons of gasoline. He was about to cross what he knew was the main line of the New York Central railroad. Not only did he know and realize that passenger trains and freights might be expected at any time, but he also knew they might appear traveling at a high rate of speed around a curve only some 2,200 to 2,600 feet from the crossing. Knowing also that he could not see this curve from his driver's seat (due to the angle at which he was crossing the tracks) he satisfied himself with one look from the right-hand window of his cab, resumed his seat "underneath the wheel of the truck and released the brake and started to cross the track." All of this had taken "3 or 4 or 5 seconds. I really don't know the exact amount of time it would take." Armed, then, with this one observation he entered upon the main line tracks with his explosive cargo despite flashing red lights and warning bells which, he "assumed"

(since his last observation of the curve had been several seconds prior thereto) were being activated solely by a nearby switch engine. As he proceeded across the tracks he was relatively blind so far as trains from the east, and especially, this particular train was concerned, due to the angle of the intersection. He had, as he puts it, "not very much" of a view to the east, from which direction the train was approaching. The switching crew referred to observed the express when it was some 800 feet from the intersection. The switch engineer sounded warning blasts from his whistle, then jumped. (He was only some 200 feet from the reasonably-to-be-expected explosion and fire.) The truck driver heard these blasts, not taking them as a signal, looked at the switch engine, and to the east (though in this direction his view was limited), and proceeded on across the tracks until he was struck. He had at no time seen the train which struck him.

It is our opinion that reasonable men could not differ upon the issue presented. The above described conduct on the part of the driver does not satisfy the statutory mandate that he proceed only under such conditions that he can do so with safety. In plain terms this driver gambled, consciously or not, upon no train's arrival during the time his observations were elsewhere, and he lost. This conduct is proscribed by statute. In our view of the case the doctrine of subsequent negligence is not applicable. Nor is there a jury question before us.

Affirmed. Costs to appellee.

KELLY, BLACK, and EDWARDS, JJ., concurred with SMITH, J.

VOELKER, J. (*concurring in reversal*). Boiled down to its essentials, the basic question in this case is whether the trial judge was warranted, under the

rule of favorable view, in taking the questions of negligence and contributory negligence away from the jury. Under the circumstances of this case we think he was not. We have recently been at some pains to declare that the question of plaintiff's contributory negligence should usually be judged not alone by what the plaintiff did or failed to do, but also by the conjoining facts of what in the way of legal duty the plaintiff reasonably had a right to expect from the defendant (*Hoffman* v. *Burkhead,* 353 Mich 47, 56, quoting approvingly from *Weller* v. *Mancha,* 351 Mich 50, 67).

Had the crew of the switch engine dismounted and waved the plaintiff across the tracks or, again, had some other railroad employee done so, erroneously telling the plaintiff that the flasher signals were out of order, could the defendant railroad have blandly wrapped the mantle of the statute around itself to avoid possible liability? We think not. While its conduct in this case was scarcely so blatant and "invitational" we do think that reasonable men might well conclude under these circumstances that the defendant may have negligently lulled the plaintiff into a false sense of security and in effect have negligently lured him to his harm. At least we think a fair jury question was presented on that score. Moreover, that trained lawyers on this Court should in this case split over the question is perhaps some further indication that the disputed issues should more properly have been left to the jury under appropriate instructions.